RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0194p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JENNIFER LEE SMITH,

*Plaintiff-Appellant,*

v.

No. 05-5655

CONTINENTAL CASUALTY CO.; COUNTRYWIDE
CREDIT INDUSTRIES, INC.,

*Defendants-Appellees.*

>

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 02-00093—Jennifer B. Coffman, District Judge.

Argued: April 28, 2006

Decided and Filed: June 13, 2006

Before: KENNEDY, COLE, and McKEAGUE, Circuit Judges.

_____

### COUNSEL

**ARGUED:** James M. Morris, MORRIS & MORRIS, Lexington, Kentucky, for Appellant. Philip F. Brown, BRENNER, BROWN, GOLIAN & McCAFFREY CO., LPA, Columbus, Ohio, for Appellees. **ON BRIEF:** James M. Morris, Sharon K. Morris, MORRIS & MORRIS, Lexington, Kentucky, for Appellant. Philip F. Brown, BRENNER, BROWN, GOLIAN & McCAFFREY CO., LPA, Columbus, Ohio, for Appellees.

_____

### OPINION

_____

McKEAGUE, Circuit Judge. Plaintiff-appellant Jennifer Lee Smith appeals the district court's grant of judgment in favor of defendants-appellees Continental Casualty Company (CCC), *et al.* Smith filed this action following CCC's denial of her claim for short term disability benefits. CCC, a benefit plan established pursuant to ERISA, 29 U.S.C. § 1001, issued a policy for disability benefits to Smith's Employer, Countrywide Credit Industries (Countrywide). Following years of treatment for multiple medical complaints, Smith filed a claim for short term disability benefits. CCC denied Smith's application, deciding that the medical documentation did not support a finding of disability. After exhausting her administrative remedies, Smith appealed the administrator's decision to the district court. The district court upheld the decision of the plan administrator, and granted defendant's motion for summary judgment.

Following oral argument and a review of the record, we find that CCC's denial of disability benefits was arbitrary and capricious. Therefore, this case is remanded to the district court for the entry of an order requiring CCC to provide a full and fair review of Smith's disability claim.

## I. BACKGROUND

Jennifer Smith worked as a loan office branch manager for Countrywide for more than eight years prior to filing her claim for short term disability benefits. She was treated for multiple medical problems, beginning in 1991 through the date of her alleged disability in February 2001. Her documented medical problems include migraine headaches, back pain, fibromyalgia, thyroid dysfunction, hearing loss, degenerative disc disease, sleep disorder, and depression. She has undergone multiple pain management procedures, including lumbar facet block injections and lumbar facet rhizotomies.[1] Smith's ongoing treatment includes multiple prescription medications, including thyroid replacement, anti-depressants, anti-inflammatory medication, and narcotic and non-narcotic pain medications.

On January 31, 2001, Smith informed her employer that she could no longer work and filed a telephonic application for disability benefits. CCC contacted Dr. Van Bussum's office, Smith's primary care doctor, and requested information relating to Smith's disability claim. Van Bussum's disability specialist filled out a form, indicating that Smith had degenerative disc disease and fibromyalgia, and that Smith had undergone facet rhizotomy. Her estimated return-to- work date was listed as "never." Initially, CCC accepted the disability claim, and a note was made in Smith's file that the claim would be paid. However, CCC did not pay the claim and instead re-evaluated the request. CCC contacted Smith on March 26, 2001, to discuss her medical condition. She reported that she had undergone eight nerve blocks over a three month period, and had undergone facet rhizotomies on both the left and right side in an attempt to treat her degenerative disc disease. She was scheduled for repeat rhizotomies in April and May of 2001. The fibromyalgia required her to rest twice per day and participate in water therapy and mobility exercises, as well as take an anti-depressant and medication for nerve pain. Her husband had taken a leave of absence to care for her.

CCC also requested the medical records from Dr. Van Bussum and Dr. Dubal, Smith's pain specialist, for the period of January 1, 2001, through March 30, 2001. Following review of the records by Registered Nurse Linda Krasa, CCC denied the disability benefits. The April 18, 2001, denial letter stated that:

> Although we agree you may have a condition, the medical information provided does not support or illustrate a functional impairment that would prevent you from performing the material and substantial duties of your occupation as a Branch Manager for Countrywide Credit Industries. Based on the information received and reviewed, we are unable to honor your claim for disability benefits.

JA 523. The letter outlined Smith's right of appeal.

Following the denial, Van Bussum drafted a letter on June 13, 2001, detailing his treatment of Smith, and the severity of her medical problems. In the letter, Van Bussum stated:

---

[1] The facet joints are often affected by degenerative disk disease. They are the small joints along the back of the spine that allow the spine to be flexible. Facet blocks involve the injection of steroids into the area of the joint, in order to relieve pain and inflammation. Facet rhizotomy involves the use of an electrode and radio-frequency to deaden the nerve pathway that carries painful impulses to the brain. *See* THE MERCK MANUAL OF DIAGNOSIS AND THERAPY, Section 5,Chapter 59, Non-articular Rhuematism (Mark A Beers, M.D. & Robert Berkow, M.D. eds., 1999).

> Mrs. Smith has been a patient of mine since 1995. Over the past six years I have seen her become increasingly incapacitated by her medical problems. I have sought consultation from neurologists, rheumatologists, physical therapists, pain medicine specialists, and neurosurgeons. I have ordered multiple x-rays, CT scans, and MRI scans in an attempt to better define and explain her medical problems. Reports are readily available regarding the above.
>
> Unfortunately Mrs. Smith has now become unable to work. Her problem list includes lumbar and cervical spondylosis with facet arthropathy, degenerative disc disease of the cervical spine with multi-level spinal canal stenosis, degenerative disc disease of the lumbar spine, fibromyalgia, migraine headaches and cluster headache syndrome. This constellation of problems have continued to progressively worsen causing a great deal of pain and suffering for Mrs. Smith. In my professional opinion, she is permanently and totally disabled and unfortunately I have little to offer her in regards to treatment and/or pain relief.

JA 264.

On July 13, 2001, Smith appealed the denial, and forwarded 249 pages of medical records detailing the course of her medical problems spanning a period of ten years. After reviewing the records, CCC noted in Smith's file on July 19, 2001, that "medical shows history of similar complaints from 1991 to present. Medical info does not show an inability to perform material/ substantial duties of occupation." On July 23, 2001, a notation in Smith's file states that a copy of her job description was received, and on July 24, 2001, a copy of Smith's pharmacy records were received. CCC then forwarded the file for "peer review" to Dr. Kaplan, a rheumatologist employed by a medical review company. Along with the medical records, CCC sent a "file summary" note dated August 8, 2001, from Nurse Krasa that stated, *inter alia*:

> The file documents several chronic conditions that the claimant has worked with and has been treated for and continues to be treated for by the same doctors and with the same medications with no change in the prior treatment plans or referral to any other treating sources. It is of note that the claimant does not relate her medication usage prescribed by Dr. Leung to the other treating sources, specifically the Lortabs and Fiorcet both that are purchased monthly. At the same time the claimant is purchasing Oxycontin monthly from another pharmacy. See Pharmacy list enclosed.

JA 132.

On August 23, 2001, Dr. Kaplan issued his peer review opinion letter to Nurse Krasa. After reviewing 204 pages of records, he opined that Smith did suffer from degenerative arthritis and degenerative disc disease in her spine, but that the pain could be controlled through medications and injections. He found that there was no documentation of any clinical findings of impairment that would prohibit her from performing her job. Kaplan further opined that "pain is a subjective complaint and often times is out of proportion to physical findings" and "the medical records do not support more than mild musculoskeletal impairment." JA 179.

Although CCC specifically requested Dr. Kaplan to conduct a telephone interview with Dr. Van Bussum as part of the peer review, Kaplan stated in his letter that he called Van Bussum's office, but that Van Bussum's secretary reported that Smith's file had not been transferred to their new office, so they did not have the information to give to him. Kaplan submitted his peer review findings to CCC without conducting the requested interview. However, he noted in his letter that he would send an addendum after speaking to VanBussum. The interview was never conducted.

CCC received Kaplan's review on August 24, 2001, and noted in Smith's file that Kaplan's review was in agreement with the medical review conducted by the nurse case manager at CCC, and the medical record did not support Smith's inability to perform the substantial and material duties of her occupation as a Branch Manager. On this same date, a disability specialist from CCC issued a letter to Smith's attorney, stating that CCC had:

> received and reviewed the additional medical information that was submitted by your office and it does not alter our decision. The complete file, including the newly submitted medical information, was sent for an independent review by a board certified rheumatologist.

> The report of the independent review concluded that the medical evidence did not support the presence of a functional loss that would preclude [Smith] from performing the substantial and material duties of her occupation as a Branch Manager.

> As indicated in the letter dated 4/18/01 that was sent to Jennifer Smith it remains our position that the decision to deny benefits was correct and your file has been forwarded to Appeals for a formal review.

JA 183.

On September 14, 2001, CCC issued its denial following the appeal. While the letter essentially restates the contents of the initial denial on April 18, 2001, it also states:

> The office notes indicate Dr. Vanbussen (sic) saw your client on January 26, 2001, with complaints of upper back pain. We are aware that your client recently returned to work because of prior symptoms. Although Dr. Vanbussen (sic) has sent statements indicating your client is completely disabled, there were no findings included that explain how that conclusion was rendered.

JA 172. Although the letter stated that CCC was aware that Smith had returned to work, Smith had not returned to work at any time following January 31, 2001.

After Smith received this letter, she contacted CCC and asked them to consider the impact of her many medications on her ability to perform the essential functions of her position. Dr. Van Bussum sent a letter on October 22, 2001, advising CCC that Smith was taking Synthroid, Prozac, Neurontin, Oxycontin, Lortab, Fioricet, Zanaflex, Trazadone, Vivelle, Vioxx, Toradol, and Pycnogenol. In the letter, Van Bussum stated "in my medical opinion, it would be very difficult to function under any circumstances while under the influence of these medications." JA 143. CCC responded to this letter, stating that they had already considered the medications that Smith had been taking, and that this information did not change their decision. JA 141. The letter was not forwarded to Dr. Kaplan.

At this point, Smith had exhausted her administrative remedies. She filed suit in the Eastern District of Kentucky on February 22, 2002. In a subsequent discovery motion, Smith asked the district court to allow additional, limited discovery in order to determine whether the defendant artificially truncated their review of the medical record in order to engage in "willful ignorance" of Smith's disability. In response, the court issued an order noting that "it is well established that, in the Sixth Circuit, a district court reviewing an ERISA plan administrator's decision is limited solely to the record that was before the administrator at the time of the decision." JA 587. The court stated that extrinsic evidence is allowed only when there is a procedural challenge to the administrator's decision. *Id.* at 2.

Finding that Smith's challenge was of a procedural nature, the district court authorized limited discovery in order to determine:

> (1) the defendant's protocol regarding physician review, including requests for supplemental amendments; (2) the defendant's protocol regarding independent medical examinations (IMEs); (3) the defendant's relationship with reviewing physicians and their impact on the report submitted; (4) the scope of information provided to reviewing physicians by the defendant; (5) the manner in which physician reviews are conducted, including depositions of physicians who reviewed the plaintiff's claim.

JA 589.  As a result of the discovery order, Smith deposed Kristi Kuhn, Linda Krasa, and Donna Gatling, the CCC employees most closely associated with the administrative review process.

Thereafter, the parties filed cross-motions for summary judgment.  On December 28, 2004, the district court granted CCC's motion, and denied Smith's motion.  The district court found that there was substantial evidence in the record to uphold the plan administrator's decision.  The court ruled that even if "not all of the documents were provided to Dr. Kaplan, a review of all of the documents in the administrative record supports a finding that Continental's decision to deny benefits was not arbitrary and capricious." *Smith v. Cont'l Cas. Co.,* No. 02-93-JBC at 6 (E.D. Ky. Dec. 28, 2004) (hereinafter slip op.).  Further, the court found that although Kaplan never spoke directly with Van Bussum, Smith offered no evidence that Van Bussum had additional evidence outside of the record that would have impacted the determination.  The court also found that the appeals committee did not err in deciding that Smith's medication regimen did not affect their denial.  Finally, the court found that Smith's contention that CCC had an "extreme" conflict of interest because they were acting as both plan administrator and insurer was without merit, because this consideration only applies when there is "'significant evidence' that the insurer was motivated by self-interest." *Smith,* slip op. at 9.

Smith then filed a motion to alter, amend, or vacate the ruling of the district court.  On March 11, 2005, the district court denied Smith's motion, and this timely appeal followed.

## II.  JURISDICTION AND STANDARD OF REVIEW

The district court exercised subject matter jurisdiction pursuant to 29 U.S.C. § 1132 (a)(1)(B) (ERISA).  This court has jurisdiction pursuant to 28 U.S.C. § 1291, because the district court entered a final order when it granted defendant's motion for judgment in its favor, which order remained in effect after plaintiff's motion to alter, amend, or vacate the ruling was denied.

This court reviews a district court's decision concerning an ERISA denial of benefits *de novo*.  The plan administrator's decision to deny benefits to a plan recipient is subject to *de novo* review, unless the plan provides the administrator with "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 613 (6th Cir. 1998).  When the plan administrator has discretionary authority to determine benefits, as is the case here, the court reviews a denial of benefits under the "highly deferential arbitrary and capricious standard of review." *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir. 1996).

"The arbitrary and capricious standard is the least demanding form of judicial review of administrative action.  When applying the arbitrary and capricious standard, the Courts must decide whether the plan administrator's decision was rational in light of the plan's provisions.  Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Williams v. Int'l Paper Co.,* 227 F.3d 706, 712 (6th Cir. 2000) (internal citations and quotations omitted).  Although review under

the arbitrary and capricious standard is highly deferential, it "is not no review, and deference need not be abject." *McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 172 (6th Cir. 2003) (internal citation and quotation ommitted).

## III. ANALYSIS

In order to be eligible for benefits under the CCC group disability plan, the claimant must meet the following definition of disability:

> "*Disability*" means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that you are:
> 1. continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and
> 2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

CCC Group Disability Plan, JA 105 (emphasis in original).

According to the plan, the denial of a disability claim may be appealed by writing the insurance company within 60 days of the denial, and requesting a review. The company will perform a "full and fair review," and notify the claimant of its decision within 60 days. *Id.* at 117.

Smith claims that the administrator's decision to deny her disability benefits was arbitrary and capricious, because she is not able to perform the material and substantial duties of her regular occupation. Smith argues that the district court erred in affirming the administrator. She brings five issues on appeal: 1) the district court utilized the wrong standard of review, due to Appellee's obvious conflict of interest; 2) the district court failed to take into consideration CCC's false assertion that Smith had returned to work in denying her claim; 3) CCC's manipulation of the medical records, failure to interview Van Bussum, failure to conduct an evaluation, and failure to obtain a full job description negated a "full and fair review" of Smith's disability claim; 4) the district court and CCC erred when they did not consider the impact of Smith's many medications; and 5) the district court erred in disallowing Smith to continue to conduct discovery into CCC's alleged manipulation of her medical records. We consider each claim in turn.

### A. Standard of Review and Conflict of Interest

Smith asserts that the district court applied the "wrong standard of review" when it did not consider the inherent conflict of interest because of CCC acting as both administrator of the disability plan and the claims payor. In support of her position, Smith quotes *Calvert v. Firstar Finance, Inc.*:

> Although we must review Liberty's denial of benefits to Calvert under the highly deferential "arbitrary and capricious" standard, we must take into consideration the fact that Liberty is acting under a potential conflict of interest because it is both the decision-maker, determining which claims are covered, and also the payor of those claims.

409 F.3d 286, 292 (6th Cir. 2005) (citing *Marks v. Newcourt Credit Group,* 342 F.3d 444, 457 (6th Cir.2003)). The court further clarified the inquiry, stating that the possible conflict should be taken into account when deciding whether the plan administrator's decision is arbitrary and capricious. *Id.* However, the standard of review is not altered to a less deferential standard when the benefits administrator is operating under a conflict of interest. *Id.* at 293. "Instead, as noted, the standard remains unchanged and the conflict of interest is to be considered in *applying* that standard." *Id.*

(emphasis in original); *accord Kalish v. Liberty Mut./Liberty Life Assur. Co. of Boston,* 419 F.3d 501, 506 (6th Cir. 2005).

The district court properly recognized that CCC's conflict of interest was only a factor to consider in its review, and did not alter the arbitrary and capricious standard of review. *Smith*, slip op. at 8. In considering such a conflict, there must be significant evidence in the record that the insurer was motivated by self-interest, and the plaintiff bears the burden to show that a significant conflict was present. *Id.* at 9. Smith did not develop the record to show that the conflict of interest contributed to an arbitrary and capricious determination by CCC. Therefore, this claim of error is without merit.

### B. Smith's Alleged Return to Work

Smith claims that CCC inappropriately relied upon its belief that Smith had returned to work prior to the issuance of the September 14, 2001, denial letter following her appeal. The letter states " [w]e are aware that your client recently returned to work because of prior symptoms." JA 172. The record is completely devoid of any evidence that Smith returned to work at any time following her departure on January 31, 2001. If it is true, as Smith asserts, that CCC relied upon this belief in making its disability determination, the decision would not be "rational in light of the plan's provision" as required to survive arbitrary and capricious review. *Yeager,* 88 F.3d at 381.

The district court failed to address the "return to work" statement. Neither did CCC offer any explanation in its brief as to the meaning of this sentence in the denial letter. This lack of any reasonable explanation supports a finding that Smith's disability determination was not rational in view of the plan language. At a minimum, CCC should have offered some logical explanation concerning the meaning of this important assertion in the denial letter, and the district court did commit error when it failed to consider this issue.[2]

### C. CCC's Actions Negated a "Full and Fair Review"

Smith brings four claims of error concerning CCC's process in conducting the disability determination.

#### 1. Manipulation of the Medical Records

Smith claims that CCC artificially truncated the records that it sent to Dr. Kaplan for peer review of her disability claim. According to Smith, she provided 249 pages of medical records for review, and CCC provided a total of 220 pages to Kaplan, 25 of which were non-medical record documents. Kaplan's report records 204 pages of materials that were sent for review. During her deposition testimony, Nurse Krasa stated that CCC sent 114 pages of medical records from Dr. Van Bussum for peer review. However, Kaplan's review only identifies 48 pages. Krasa was unable to articulate why there was a discrepancy in the number of Van Bussum's medical records sent, and the number of records reviewed by Kaplan.[3] Likewise, CCC employee Kristi Kuhn was unable to

---

[2]CCC offered an explanation for this sentence in the denial letter for the first time during oral argument. CCC stated that the sentence referred to a period of time prior to Smith's disability claim when she returned to work following a leave for her medical condition. We find this new argument completely unconvincing, because this "return to work" was nearly a year before the denial letter, and was not during the time of the disability determination. Further, this theory was never advanced at any time prior to appellate argument.

[3]Krasa's deposition testimony was taken following Smith's request for additional discovery with regard to the process that CCC undertook in evaluating Smith's claim. Kaplan's deposition was never taken. *See* p. 7 *supra*.

explain the discrepancy in the overall number of pages of Smith's job description reviewed by Kaplan and the number sent.

In response to Smith's claim, CCC states that Nurse Krasa documented in Smith's file that 55 pages of the records submitted were duplicates. However neither Krasa or Kuhn could identify with certainty which records were actually reviewed by Kaplan. JA 609-633.[4]

The district court found that "even if not all of the documents were provided to Dr. Kaplan, a review of all of the documents in the administrative record supports a finding that Continental's decision to deny benefits was not arbitrary and capricious." *Smith,* slip op. at 6. The district court found that there was no evidence that Continental wrongfully truncated the record, or "hand picked" the documents to be submitted to Kaplan. *Id.* at 7.

Yet, there is clear evidence that there are discrepancies in the overall number of medical records that were provided to CCC for review, and the number that were in fact reviewed by Kaplan. Without knowing why there are these discrepancies, it is impossible to say that CCC did not artificially alter the record for Kaplan's review. If CCC did "hand pick" the records, then Smith's right to a "full and fair review" of her disability denial was abridged. *See* CCC policy, JA 52.

### 2. Kaplan's Failure to Interview Van Bussum

Smith claims that her right to "full and fair review" was hampered by Kaplan's failure to converse with her primary doctor, Dr. Van Bussum. CCC specifically requested Kaplan to perform a telephonic interview with Van Bussum. In Kaplan's review letter, he stated that he called Van Bussum's office, and was told that the office was in the process of moving, and Smith's file was not available. Kaplan stated that the office had no information to give to him, but that he would file an addendum to his review after speaking with Van Bussum. Kaplan never spoke to Van Bussum, never filed an addendum, and later copies of the letter lacked the addendum language completely. *Compare* JA 156-160 *with* JA 184-188. The record shows that Kaplan was paid for a teleconference, yet there is no evidence in the record that he spoke to Van Bussum.

CCC argues that "when Dr. Kaplan attempted to discuss the matter with Dr. Van Bussum, he was rebuffed . . . . The fact that Dr. Van Bussum *refused* to discuss Appellant's case with Dr. Kaplan renders his conclusions suspicious at best." Br. of Appellee at 31. However, the record does not support the assertion that Van Bussum "rebuffed" Kaplan's attempt to speak to him. It merely supports the assertion that Van Bussum's office was moving, and that Smith's file was not present at the time Kaplan called. There is no evidence in the record that Kaplan tried at a later date to contact Van Bussum.

The district court found that there was no evidence that a telephone conference with Van Bussum would have resulted in Kaplan issuing a different report. *Smith,* slip op. at 6. "Further, the plaintiff does not offer evidence that Dr. Van Bussum had any additional information beyond this report to offer Dr. Kaplan had they spoken on the telephone." *Id.* The district court failed to consider the fact that Kaplan hadn't completely reviewed Van Bussum's records, and there was no way of knowing which records Kaplan did review. Under the circumstances, Kaplan could have learned additional information from this conference. Kaplan's failure to conduct the requested interview and CCC's issuance of the denial notwithstanding Kaplan's failure to do so supports the contention that its determination was arbitrary and capricious.

---

[4]In her deposition, Krasa stated that she had no idea what documents were omitted from the review, and she could not identify what documents were or were not sent to Kaplan.

While Van Bussum's opinion as Smiths' treating physician does not have to be afforded special deference by an ERISA plan administrator pursuant to the Supreme Court's holding in *Black & Decker Disability Plan v. Nord,* neither can CCC "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." 538 U.S. 822, 834 (2003). Here, Kaplan did not review all of Van Bussum's records, nor did he conduct the requested teleconference. Although Kaplan acknowledged that Van Bussum had opined that Smith was disabled, he did not discuss Van Bussum's opinion any further in his peer review letter to CCC. The extent of Kaplan's review of Van Bussum's treatment of Smith is simply not known because of the discrepancy in the medical records. Because Kaplan's peer review provides the basis of CCC's ultimate denial, it cannot be said with certainty that Smith had the "full and fair review" she was entitled to under the plan.

CCC argues that the "assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, . . . a specialist engaged by the plan has expertise the treating physician lacks." *Nord,* 538 U.S. at 832. CCC then states that in keeping with *Nord*, it makes scant sense to credit Van Bussum's opinion over Kaplan's, because Kaplan is a board certified rheumatologist, while Van Bussum is a family practitioner. However, *Nord* concerns itself with the "treating physician rule," and stands for the proposition that a treating physician's opinion should not be given deference over a plan consultant's opinion. It does not stand for the proposition that the opinion of a plan consultant who is a specialist should be accorded deference over a treating physician who is not. *See id.* CCC misinterprets the meaning of this passage in *Nord*.

While CCC was not required to give *deference* to Dr. Van Bussum's opinion under the holding in *Nord*, CCC's failure to have Kaplan fully review Van Bussum's record, and CCC's subsequent issuance of a denial without having Kaplan conduct the requested telephone interview supports a finding that CCC's decision was arbitrary and capricious.

### *3. CCC's Failure to Conduct an Independent Evaluation of Smith*

Smith argues that CCC's failure to conduct an independent evaluation is additional evidence that the denial of her disability claim was arbitrary and capricious. Smith relies on this circuit's holding in *Calvert* to advance the theory that a disability determination based on a file review alone may, in some instances, be an indication that the administrator's decision was arbitrary and capricious.

In *Calvert*, the plaintiff suffered a back injury and did not return to work. 409 F.3d at 289. The disability plan administrator denied her request for long term disability benefits based on a review of the plaintiff's medical record alone, even though the plan afforded the administrator the right to have the patient examined. 409 F.3d at 295. When the plaintiff objected to the "pure paper review," this court found that although the plan provision allowed the administrator to conduct an independent examination, the plan was not required to do so. *Id.* However, we stated:

> while we find that Liberty's reliance on a file review does not, standing alone, require the conclusion that Liberty acted improperly, we find the failure to conduct a physical examination - - especially where the right to do so is specifically reserved in the plan - - may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.

*Id.* This court ruled that although there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination," the file review performed in *Calvert* was inadequate because the physician did not describe the data that he reviewed in reaching his

decision, and he made credibility determinations concerning the patient's subjective complaints without the benefit of a physical examination. *Id.* at 296.[5]

The facts here are similar to those in *Calvert.* Like the reviewer in *Calvert*, Kaplan made a credibility determination concerning Smith's complaints of pain. In his letter, Kaplan states: "Ms. Smith has ongoing pain complaints. Pain is a subjective complaint and *often times is out of proportion to physical findings.*" JA 179 (emphasis added). This conclusory statement about Smith's pain suggests that Kaplan does not believe Smith's pain is a credible complaint.

CCC distinguishes *Calvert* by stating that the court found that the "paper review" conducted in *Calvert* was inadequate because the physician did not identify the objective medical evidence he reviewed in order to reach his determination. Further, CCC argues that the evidence in Calvert's record was in conflict with the reviewing physician's determination, while here, the evidence in the record is in keeping with Kaplan's decision. We agree that Kaplan does discuss objective medical findings in his peer review report, however, Kaplan also makes credibility findings concerning Smith's pain without the benefit of a physical exam.

Here, as in *Calvert,* CCC has reserved the right to obtain an independent medical examination of a claimant. Following the ruling in *Calvert*, we consider CCC's decision to *not* require an examination as part of the arbitrary and capricious review, especially because Kaplan made credibility determinations concerning Smith's subjective complaints. CCC could have obtained an independent medical examination to evaluate Smith's pain. Their decision to not perform this examination supports the finding that their determination was arbitrary.

*4. CCC's Failure to Obtain a Job Description*

Smith argues that CCC's failure to obtain a job description prior to its initial determination finding that she was not disabled supports a finding that CCC's decision was arbitrary and capricious. CCC did eventually have a full nine page job description in Smith's file. However, Kaplan reviewed only seven pages of Smith's job description. As we have previously noted, CCC is unable to account for the discrepancy in the number of documents it had in Smith's file, and the number that were actually reviewed by Kaplan. We agree that this discrepancy suggests that CCC's decision was arbitrary and capricious.

In summary, the process CCC used in making Smith's disability determination rendered a decision that was arbitrary and capricious. The discrepancies in the medical records that were reviewed, Kaplan's failure to contact Smith's treating physician, CCC's decision to not conduct an independent physical examination, and Kaplan's failure to review a full job description all support this finding.

**D. CCC and the District Court Failed to Consider Smith's Medications**

Following the final denial letter sent to Smith by CCC on September 14, 2001, Smith contacted CCC and asked them to consider the effects of the multiple medications that she is required to take in order to control her symptoms. In support of her argument, Dr. Van Bussum drafted a letter listing Smith's many medications, including Synthroid, Prozac, Neurontin, Oxycontin, Lortab, Fioricet, Zanaflex, Trazadone, Vivelle, Vioxx, Toradol, and Pycnogenol. Van Bussum stated that "in my medical opinion, it would be very difficult to function under any circumstances while under the influence of these medications." JA 143. CCC acknowledged receipt

---

[5]The court stated "where, as here, however, the conclusions from that review include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate." *Calvert,* 409 F.3d at 297, n.6.

of this letter, and in their November 26, 2001, response stated "[t]his information does not warrant a change in our decision.  Previously, we reviewed a listing of your client's pharmacy statements and were aware of the medication being prescribed."  JA 141.

In support of Smith's argument that the effects of her many medications should have been considered in her disability determination, she cites *Adams v. Prudential Ins. Co. of America*, 280 F. Supp 2d 731 (N.D. Ohio 2003).  In *Adams*, the court found that the plan administrator's denial of Adam's disability benefits was arbitrary and capricious because the administrator failed to consider the effects of Adams' multiple medications on his ability to perform his job.  *Id.* at 740.  Like Smith, Adams was taking Oxycontin and other narcotic pain relievers to manage his symptoms.  *Id.*  Adams' personal physician opined that these medications would impede Adams' ability to work at any job.  *Id.*  However, Prudential's reviewing physician merely listed Adams' medications in his report without discussing any possible effects the drugs might have on Adams' ability to do his job.

Like Adams, Smith's personal physician opined that the effects of Smith's many medications would make it impossible for her to "function under any circumstances."  However, in the peer review letter, Kaplan does not address Smith's medications except to list some of them and state that Dr. Dubal has "prescribed OxyContin, Vioxx, and Skelaxin and reported that 'she is getting (the) most benefit out of this medication without side effects.'"  JA 179.  In fact, Kaplan never saw the letter drafted by Van Bussum concerning Smith's medications at all, because CCC failed to forward it to him.

CCC argues that *Adams* is distinguishable, because Kaplan did address Smith's medications in his peer review report, as noted above.  Further, CCC states that: "[a]ppellant had taken the vast majority of the medications listed by Dr. Van Bussum while she performed the duties of her occupation before claiming disability."  Br. of Appellee at 47.  CCC argues that the only new medications added since Smith claimed that she was disabled were "Trazadone, an anti-depressant, Toradol, a form of ibuprofen, and Pycnogenol, an anti-oxidant."  *Id.*

We find CCC's argument unconvincing.  CCC's failure to adequately consider the number and nature of the medications Smith was taking, its failure to have Dr. Van Bussum's letter evaluated by Kaplan coupled with Kaplan's cursory discussion and careful selection of a *single* comment in the pain specialist's progress note supports Smith's argument that her disability determination was arbitrary and capricious.

### E. The District Court's Refusal to Allow Additional Discovery

As previously discussed, the district court allowed additional discovery to ascertain the procedure CCC used in deciding Smith's disability determination.[6]  On appeal, Smith argues that the district court erred when it denied additional discovery into CCC's procedure.  Because we are remanding this case for a full and fair review of Smith's disability claim, it is unnecessary for us to consider this claim on appeal.

### IV.  CONCLUSION

For the aforementioned reasons, we VACATE the judgment of the district court and REMAND this case for entry of an order requiring CCC to conduct a full and fair review of Smith's disability claim.

---

[6]*See* p. 7, *supra.*