NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0651n.06

**Nos. 09-1562 & 09-1565**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

GERALDINE BELL, )
)
  Plaintiff-Appellant Cross-Appellee, )
)
v. )
)
     ) On Appeal from the United States
AMERITECH SICKNESS AND ACCIDENT ) District Court for the Eastern
DISABILITY BENEFIT PLAN, ) District of Michigan
)
  Defendant-Appellee Cross-Appellant. )
)
)

Before:  BOGGS and NORRIS, Circuit Judges; ADAMS, District Judge.[*]

  BOGGS, Circuit Judge. Geraldine Bell (Bell) was a long-time employee of Michigan

Bell and a participant in the company's disability plan, the Ameritech Sickness and Accident

Disability Benefit Plan (the Plan). Bell suffered several injuries in a car accident and filed a claim

with the Plan for short-term disability benefits. The Plan initially granted Bell's claim, but

discontinued the benefits after two months. Bell appealed the Plan's decision to discontinue her

benefits, but the Plan affirmed its decision. Bell then brought an action against the Plan under 29

U.S.C. § 1132 (ERISA § 502). After allowing limited discovery and reviewing the administrative

record, the district court granted judgment in favor of the Plan. Bell now appeals the district court's

---

  [*]The Honorable John R. Adams, United States District Judge for the Northern District of
Ohio, sitting by designation.

(1) refusal to allow broader discovery, (2) failure to fashion relief that mitigated the effects of the Plan's failure to comply with a discovery order, and (3) decision to grant judgment in favor of the Plan. The Plan cross-appeals the district court's decision to award monetary sanctions against the Plan for its alleged failure to comply with a discovery order. Because the district court neither abused its discretion in limiting discovery and imposing sanctions nor erred in granting judgment in favor of the Plan, we affirm the district court's orders.

**I**

Bell worked as a telecommunications specialist for Michigan Bell, a job that involved sitting, talking on the phone, and typing. A.R. at 77, 217-23. As a Michigan Bell employee, Bell was covered by the Plan, which offered both short-term and long-term disability benefits. *See* R. 29.

On April 5, 2005, Bell was involved in a high-speed car accident. A.R. at 263. Although Bell was able to walk away from the accident, she suffered injuries that led her to seek medical attention. A.R. at 306-07. Bell's physician, Dr. Zack Brown, diagnosed Bell with cervical whiplash, trauma to the lumbar spine, migraine headache, and a sprain of both hands. A.R. at 307.

Bell's injuries led her to seek short-term disability benefits from the Plan. Under the terms of the Plan, Bell was only eligible for benefits if she met the Plan's definition of disability: "a sickness or injury, supported by objective medical documentation, that prevents the Eligible Employee from performing the duties of his/her . . . job . . . ." R. 29 at 2.

On April 15, 2005, Bell began receiving conditional benefits from the Plan.[1] A.R. at 321. On the same day, the Plan sent Bell a letter explaining that she and her physicians needed to submit "medical information to substantiate [her] disability." *Ibid.* The letter stressed that "[i]t is critical that your physician demonstrates by his/her observations and clinical findings that you are unable to perform your work with or without accommodations," because "[t]his is the information which will allow [the Plan] to make a determination of your eligibility for benefit payments . . . ." *Ibid.*

On May 2, Dr. Brown sent his treatment notes to the Plan. A.R. at 305-09. These notes recorded (1) tenderness around Bell's cervical spine; (2) tenderness along her lumbar spine; and (3) tenderness and swelling in both hands. A.R. at 307. They also included a diagnosis of cervical whiplash, trauma to the lumbar spine, migraine headaches, and a sprain of both hands. *Ibid.*

On May 5, the Plan sent Bell a letter approving the payment of benefits from April 13, 2005 through May 22, 2005. *Id.* at 305.

On May 18, 2005, at the Plan's behest, Dr. Brown completed and submitted a form regarding Bell's current diagnosis, functional limitations, and treatment plan. A.R. at 299. Five days later, the Plan approved an extension of Bell's benefits to June 12, 2005. A.R. at 300. The Plan indicated that Bell would need to submit further medical documentation by June 7, 2005 if she wished to further extend her benefits. *Ibid.*

Neither Bell nor Dr. Brown submitted any further documentation by June 7. A Plan representative called Bell on June 7 and June 10 to reiterate the need for further medical information,

---

[1] These benefits were conditioned on Bell's submission, by May 3, of documentation demonstrating that she satisfied the Plan's definition of disability. A.R. at 322.

but Bell and her doctors still failed to submit documentation. *See* A.R. at 71. Finally, on June 16, the Plan dispatched a letter to Bell indicating that she did not qualify for further benefits because "no additional [medical] information has been received to support continued sickness disability benefits beyond June 12, 2005." A.R. at 291. With the letter, the Plan also provided a copy of the Plan's appeal procedures, which included a summary of the type of medical information and documentation that could support a claim for benefits. A.R. at 257-58.

On June 16, the same day that the Plan dispatched the denial letter, Dr. Brown finally faxed updated treatment notes to the Plan. A.R. at 288. These recorded various physical therapy visits and cataloged Bell's continuing complaints of pain. A.R. at 289-90.

In response to this new submission, the Plan sent Bell a letter indicating that "this information does not alter the previous denial decision." A.R. at 285. Although the letter did not elaborate further, the Plan's internal records indicate that the Plan declined to reinstate benefits because Dr. Brown's notes "contain[ed] no obj[ective] phys[ical] exam finds, [range of motion] and strength values, or any other documentation suggestive of severe impairment." A.R. at 68.

Upon receiving this letter, Bell called the Plan and learned that the Plan denied her claim because "medical didn't support" it. *Ibid.* Bell apparently reported this problem to Dr. Brown, who submitted a further note to the Plan on June 28, 2005. A.R. at 277-80. This note indicated that Bell continued to complain of pain in her wrists, hands, and back. A.R. at 278-79. The note also set forth Bell's functional limitations, which included restrictions on her ability to (1) grasp, squeeze, carry, reach, push, and pull with her hands; (2) bend, stoop, twist, kneel, or squat; (3) bend or twist her neck; and (4) ambulate for long periods or climb stairs. A.R. at 278-79.

On June 29, 2005, the Plan sent Bell a letter indicating that Dr. Brown's note "does not alter the previous denial decision." A.R. at 27. Bell again called the Plan, and a Plan representative told her that "objective information," such as an EMG, would help support her claim. A.R. at 62-63.

On July 13, 2005, Dr. Brown sent the Plan a neurological examination report and a mental status assessment. A.R. at 261-66. The neurological examination report indicated that a "complete neurological examination was done," but did not include any further information regarding the exam. A.R. at 262. The report presented three diagnoses: (1) cervical and lumbrosacral sprain; (2) "suspected" carpal tunnel syndrome; and (3) headache. A.R. at 262. The mental status assessment, completed by Bell's psychiatrist, noted that Bell reported anxiety, fear, trouble sleeping, difficulty driving, and flashbacks. A.R. at 263. The assessment also observed that Bell looked anxious and had a depressed affect. A.R. at 264. Bell's psychiatrist diagnosed her with post-traumatic stress disorder and assessed a GAF[2] rating of 35. *Ibid.* He prescribed Klonopin and a "small dose of Lexapro." A.R. at 265.

On August 3, 2005, Dr. Brown sent the Plan an MRI report and a note. A.R. at 243-47. The MRI report indicated that there was a posterior disc extrusion in Bell's cervical spine, but that there was no impingement of the spinal cord. A.R. at 244. There were no visible abnormalities in Bell's lumbar spine. *Ibid.* Dr. Brown's note indicated that Bell still complained of severe pain, A.R. at 246, and also that Bell "has been given Vicodin" every four to six hours to manage the pain. *Ibid.*

---

[2]The GAF, or Global Assessment of Functioning, represents "the clinician's judgment of the individual's overall level of functioning." *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., text rev. 2000).

Dr. Brown concluded that Bell was totally incapacitated because of the pain and "also because of the severe side effect caused by the medication (sleep)." A.R. at 246-47.

The Plan again sent Bell a letter indicating that the various information submitted by her doctors did not alter the Plan's previous denial decision. A.R. at 242. On August 8, 2005, Bell finally filed an appeal. A.R at 232.

Bell's doctors subsequently sent several documents to the Plan in support of Bell's appeal. These documents primarily reiterated the statements made by the doctors in their previous post-denial submissions and added that each doctor believed that Bell was totally disabled. A.R. at 229-31. The documents did include one new report on Bell's EMG results, but this report stated that the EMG showed no abnormalities. A.R. at 229.

On August 29, 2005,[3] after confirming that Bell had nothing further to submit, the Plan referred Bell's file to Network Medical Review, an "independent review organization" that provides physician review services for the Plan. NMR forwarded Bell's file to four doctors–a board-certified internist (Dr. Leonard Sonne), a board-certified neurologist (Dr. Joseph Jares), an orthopedic surgeon (Dr. Jeffrey Been), and a board-certified psychiatrist (Dr. Irwin Greenberg)–for review.

All four doctors reviewed Bell's job requirements and the various documents submitted by Bell's physicians, and each concluded that Bell was not disabled. In their reports, the reviewing doctors emphasized that the record consisted primarily of Bell's complaints and her doctors' diagnoses and contained very little objective documentation that would substantiate her injuries or

---

[3]Bell returned to work on August 30, 2005.

her inability to perform her job function. Further, Drs. Sonne and Been noted that the functional limitations listed by Bell's doctors would not preclude her from performing her sedentary duties. In light of the Plan's provisions–which defined disability to include only those illnesses or injuries supported by objective medical documentation–each doctor concluded that Bell was not disabled for her job as of June 13, 2005, and thereafter.

Upon receiving the reports of Drs. Sonne, Jares, Been, and Greenberg, the Plan decided to uphold the denial of Bell's benefits. A.R. at 193-95. In a letter to Bell, the Plan reviewed the findings of the four doctors and emphasized the absence of objective documentation to substantiate her disability. A.R. at 193. The Plan acknowledged the limitations on Bell's ability to bend, stoop, twist, kneel, squat, and grasp or carry objects, but concluded that "the physical limitations provided do not impact your usual and customary job functions." A.R. at 194.

On February 13, 2006, Bell filed suit against the Plan under 29 U.S.C. § 1132 in Wayne County Circuit Court. The Plan removed the case to the United States District Court for the Eastern District of Michigan. Bell moved to compel discovery on whether NMR violated its own applicable procedures by failing to contact Bell's doctors, as well as on the extent of NMR's conflict of interest. The district court referred the motion to a magistrate judge, who declined to allow discovery regarding NMR's conflict of interest, but ordered the Plan to produce documents pertaining to NMR's procedures and obligations on behalf of the Plan. The district court overruled both parties' objections to the order.

In response to the magistrate judge's order, the Plan produced only a two-page referral form that the Plan sent to NMR when it requested a review of Bell's file. Bell argued that this did not

comply with the magistrate judge's discovery order and filed a motion for sanctions. At the same time, both the Plan and Bell filed motions for judgment on the administrative record.

The district court referred all motions to the magistrate judge. The magistrate judge found that the Plan had violated the court's discovery order and imposed a $2000 sanction upon the Plan. Nevertheless, without ordering further discovery or granting additional relief, the magistrate issued a report and recommendation advising that the Plan's motion for judgment upon the administrative record should be granted.

Bell and the Plan both filed objections to the magistrate judge's order imposing sanctions. Bell also filed an objection to the magistrate judge's report and recommendation. In a single order, the district court overruled both parties' objections and accepted and adopted the magistrate judge's report and recommendation.

Bell filed a timely appeal, and the Plan cross-appealed.

**II**

**A**

Bell and the Plan both challenge the district court's order overruling their objections to the sanctions imposed by the magistrate judge. Under Federal Rule of Civil Procedure 37, if a party fails to obey a discovery order, the district court "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure . . . ." Fed. R. Civ. P. 37(b)(2)(C). Additionally, the court may issue "further just orders," including an order "directing that matters embraced in the order or other designated facts be taken as established for the purposes of the action, as the prevailing party claims." Fed. R. Civ. P.

37(b)(2)(A). This court reviews a district court's decision regarding Rule 37 sanctions for an abuse of discretion. *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 525 (6th Cir. 2005) (citing *Toth v. Grand Trunk R.R.*, 306 F.3d 335, 343 (6th Cir. 2002)).

Here, the magistrate judge imposed a $2000 sanction on the Plan for failing to comply with its discovery order, but declined to issue any further orders. The district court overruled all objections to the sanctions. Both parties believe that this was an abuse of discretion, but for quite different reasons. The Plan argues that the district court should not have imposed any sanctions, both because discovery is impermissible in ERISA actions and because the Plan complied with the discovery order. Appellee's Brief at 9-12. Bell, in contrast, contends that the district court's sanctions were inadequate and that the district court should have issued an order directing that various allegations regarding NMR's procedures be taken as true for the purposes of the litigation. Appellant's Brief at 22-24.

We hold that the district court did not abuse its discretion. Although discovery is normally inappropriate in ERISA benefit actions, the district court may allow discovery when evidence is sought "in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring).[4] Here, Bell sought discovery to determine whether NMR's doctors violated their obligations to NMR or the Plan by failing to contact her physicians. This court has held that, under certain circumstances, when a plan

---

[4]Although Judge Gilman's opinion in *Wilkins* was nominally a concurrence, he wrote for the majority on this issue.

administrator explicitly instructs an independent reviewer to contact a claimant's physician, the reviewer's failure to do so may contribute to a finding that the review was not "full and fair." *See Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 261-62 (6th Cir. 2006). Bell's request for discovery may thus have suggested a procedural challenge. Further, Bell provided some evidence suggesting that NMR normally contacted a claimant's doctors. The Plan's response to Bell's request merely asserted that discovery was unavailable in ERISA actions. Under these circumstances, the magistrate judge and the district court did not err by ordering discovery.

Despite the Plan's representations otherwise, the Plan did not comply with the magistrate judge's discovery order.[5] The magistrate judge ordered the Plan to produce "the procedures use by the third party reviewer and the methods they follow, including any brochures, booklets, and copies of the contract with the Plan setting forth the obligations of the reviewer on behalf of the Plan." The Plan produced only a two-page referral form that included a list of "Questions for Physician Advisor to address." This was plainly insufficient to satisfy the magistrate judge's discovery order, and monetary sanctions were therefore appropriate.

---

[5]The Plan suggests that the district court's order overruling objections to the magistrate judge's discovery order, rather than the magistrate judge's discovery order itself, governed the Plan's discovery obligations. This is incorrect. Under 28 U.S.C. § 636(b)(1)(A), a district judge may refer a nondispositive pretrial matter to a magistrate to hear and decide. *See also* Fed. R. Civ. P. 72(a). The magistrate judge must then issue an "order stating the decision." *Ibid.* Unlike the "recommended disposition" that a magistrate judge issues on a dispositive motion, this order is binding. *See ibid.*; Fed. R. Civ. P. 72(b)(1). The parties may object to the order, but it remains binding except to the extent that the district court modifies or sets aside any part of the order that is clearly erroneous or contrary to law. Fed. R. Civ. P. 72(a). In this case, the district court specifically declined to modify the relevant portions of the magistrate judge's discovery order, so the magistrate judge's order defined the Plan's obligations.

Yet, contrary to Bell's contentions, there was no need for the district court to issue further orders in response to the Plan's disobedience. As the district court correctly concluded after reviewing the full record, the discovery Bell sought would not have impacted the ultimate outcome of the case.[6] In general, a plan administrator may rely on a file review and is not required to interview treating physicians. *Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383, 393 (6th Cir. 2009) (citing *Glen v. MetLife*, 461 F.3d 660, 671 (6th Cir. 2006), *aff'd*, 128 S. Ct. 2343 (2008)). As noted above, an independent reviewer's failure to obey an explicit instruction to contact a treating physician may compromise the review process, *but only* where the independent reviewer also neglects to engage in a complete and consistent review of the record.[7] *See Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 170 (6th Cir. 2007); *Smith*, 450 F.3d at 261-62. Here, NMR's physicians each reviewed all of the documents that Bell submitted and provided a fair assessment of their contents. As a result, the Plan could properly rely on their opinions, even if they did not follow their normal physician-contact procedures.[8] There was thus no need for the district court to issue further

---

[6]At first glance, this may appear inconsistent with our conclusion that discovery was appropriate. Yet we recognize that the circumstances that existed at the time that the district court ordered discovery (before the parties developed their arguments and before the court had fully reviewed the record) differed from those that existed eight months later when the district court issued its order regarding sanctions (after the court had received both parties' motions for judgment and had reviewed the record). The propriety of the district court's discovery order should not be judged by hindsight, nor should the district court be required to issue an order to mitigate the effect of misbehavior by a party that had no effect.

[7]The situation might be different if the plan documents themselves required the plan administrator to contact the claimant's treating physician, but that is not the case here.

[8]We do not address here whether an independent reviewer's failure to comply with its own physician-contact procedures bears the same significance as a reviewer's failure to comply with an

orders mitigating the effect of the Plan's disobedience because that disobedience had no effect upon the district court's review.[9] *Cf. Tisdale*, 415 F.3d at 525 (noting that this court considers "prejudice resulting from the discovery abuse" in determining whether sanctions were appropriate).

**B**

Bell also challenges the district court's refusal to allow discovery with respect to the scope of NMR's conflicts of interest. A plan administrator's conflict of interest "must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (internal quotation marks and citation omitted). A conflict exists for ERISA purposes where "a plan administrator both evaluates claims for benefits and pays benefit claims . . . ." *Met. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2348 (2008). Such a conflict may influence the objectivity of the physicians retained by the plan. *See, e.g.*, *DeLisle v. Sun Life Assurance Co. of Can.*, 558 F.3d 440, 445 (6th Cir. 2009) (noting that a conflict may create an incentive for the plan to hire physicians inclined to deny benefits). Discovery may be appropriate to determine the weight to accord to a conflict of interest, *see Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 293 n.2 (6th Cir. 2005), but the district court retains discretion to decide when to allow such discovery. *Johnson v. Conn. Gen. Life Ins. Co.*, 324 F. App'x 459, 467 (6th Cir. 2009). Accordingly,

---

explicit instruction from the plan to contact a claimant's physician.

[9]Bell also suggests that the violation of the procedures may have served as evidence of bias. It is unclear, however, how NMR's failure to contact Bell's physicians would have demonstrated bias. Moreover, NMR's doctors grounded their opinions on the absence of objective medical information, which Bell's physicians had been given many opportunities to submit, and which was easy to confirm on review. It was thus unnecessary to admit evidence of procedural irregularities to assess the influence of bias on the NMR doctors' opinions.

we review a district court's decision to deny discovery for an abuse of discretion. *Ibid*.; *see also*

*Green v. Nevers*, 196 F.3d 627, 632 (6th Cir. 1999) ("Rulings concerning the scope of discovery are

generally reviewed for abuse of discretion.").

We conclude that the district court did not abuse its discretion when it denied Bell's request

for discovery regarding NMR's conflicts of interest. There was no need for such discovery. NMR's

doctors did not deny the accuracy of Bell's doctors' medical opinions or offer alternative diagnoses;

rather, they simply determined that the objective documentation in the record, on its own, was

insufficient to support a finding of disability. The district court was quite capable of determining

whether the doctors properly identified "objective medical documentation" and reached conclusions

consistent with that documentation. Thus, evidence arguably implicating general bias would not

have aided this particular review.

### III

Bell next challenges the district court's decision to grant judgment in favor of the Plan. This

court reviews *de novo* a district court decision that grants judgment in an ERISA disability action

based on the administrative record. *DeLisle*, 558 F.3d at 444 (citing *Glenn*, 461 F.3d at 665). When,

as in this case, the plan affords the administrator discretionary authority over benefit determinations,

the court reviews the denial of benefits under the "arbitrary and capricious" standard. *Cox v.*

*Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009) (citing *Gismondi v. United Techs. Corp.*, 408

F.3d 295, 298 (6th Cir. 2005)). Under that standard, the plan administrator's decision must be upheld

if it is the result of a deliberate, principled reasoning process and is supported by substantial

evidence. *DeLisle*, 558 F.3d at 444 (citing *Glenn*, 461 F.3d at 666). The ultimate question in any

disability case on "arbitrary and capricious" review "is whether the plan can offer a reasoned explanation, based on the evidence, for its judgment that a clamant was not 'disabled' within the plan's terms." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 618 (6th Cir. 2006).

On its face, the Plan's decision to discontinue Bell's benefits was not arbitrary or capricious. The Plan documents defined "disability" as "a sickness or injury, *supported by objective medical documentation*, that prevents the . . . [e]mployee from performing the duties" of her job (emphasis added). As the NMR doctors who reviewed Bell's file concluded, the documents submitted by Bell consisted primarily of her subjective complaints and her physicians' diagnoses. Bell's doctors provided a few observations regarding tenderness, sensitivity to touch, and anxious appearance, but nothing that would suggest impairments so significant as to preclude her ability to function as a telecommunications specialist.[10] Likewise, the functional limitations listed by Bell's doctors did not appear to inhibit her capacity to sit, talk on the phone, or type.

Bell, however, identifies several factors that allegedly render the Plan's decision arbitrary, each of which we shall address in turn. First, Bell argues that the Plan improperly modified the "objective documentation" standard, and instead required "clinical documentation." Appellant's Brief at 38. This argument lacks merit. Although the Plan and the NMR physicians did refer to "clinical" evidence, they also referred to "objective medical documentation," and they stressed the absence of such documentation as the defect in Bell's claim.

---

[10]Indeed, Bell's MRI and EMG results showed no abnormalities, except for a disk extrusion in her cervical spine that was not impinging on her spinal chord.

Next, Bell contends that the Plan arbitrarily dismissed "objective" evidence submitted by her doctors. Appellant's Brief at 28. In particular, Bell suggests that the Plan improperly interpreted "objective medical documentation" to exclude her reports of pain, her psychiatrist's GAF rating, and her doctors' diagnoses. Appellant's Brief at 29-34. We disagree. Where a plan grants the administrator discretion to interpret its terms, the administrator's interpretation must be upheld unless it is arbitrary and capricious, or unreasonable. *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998). A patient's unsubstantiated complaints are the essence of subjective evidence, and a doctor's simple statement of a diagnosis or GAF rating conveys nothing regarding the observations or objective information that led to it. Accordingly, the Plan's interpretation of the term "objective medical documentation" was reasonable, and we must uphold it.

Bell also argues that the Plan arbitrarily accepted the opinions of its own doctors and rejected the opinions of Bell's doctors. She believes that this was particularly inappropriate in light of the Plan's failure to perform a physical examination of Bell. Under the present circumstances, this argument carries little weight. A plan, of course, may not arbitrarily refuse to credit the opinions of a treating physician. *Black & Decker Disability Plan v. Nord*, 338 U.S. 522, 834 (2003). Further, although a plan may engage in a file review in lieu of a physical examination, the failure to conduct a physical examination may raise questions about the thoroughness and accuracy of the benefits determination. *Helfman*, 573 F.3d at 393 (citing *Calvert*, 409 F.3d at 296). "[W]here an administrator exercises its discretion to conduct a file review, credibility determinations without the benefit of a physical examination support a conclusion that the decision was arbitrary." *Id.* at 395-96. Here, however, neither the Plan nor the NMR doctors rendered credibility determinations or

second-guessed the medical opinions of Bell's physicians. Rather, they simply determined that the objective medical documentation in the record did not, on its own, support a finding of disability. This was not improper or arbitrary, but rather was consistent with the Plan's definition of disability. Further, the Plan's decision to conduct only a file review was not improper in this case, as the Plan documents specifically placed the burden on Bell to produce objective medical documentation that supported her disability.[11]

Bell next asserts that the Plan failed to analyze the effects of her medications and that this supports a finding of arbitrariness. Although we agree that the "failure to adequately consider the number and nature of the medication [that a claimant] was taking" may support a finding of arbitrariness, *Smith*, 450 F.3d at 265, we do not believe that the Plan acted arbitrarily in this case. Nothing in the record indicates that the medications Bell was taking as of June 12, 2005–Klonopin and a small dose of Lexapro–caused Bell to suffer any negative side effects, nor did any physician opine that the drugs could interfere with her work. There was evidence that Bell began to take Vicodin and that the drug rendered her "sleepy." But the record suggests that she began taking Vicodin in late July, over a month after the initial benefit denial and just over a month before she returned to work. As a result, the medication's side effects were not relevant to the determination of whether Bell was disabled from June 12, 2005 to August 30, 2005, the only period under review.

---

[11]In particular, Section 5.6 of the Plan documents provides: "If an Eligible Employee fails to provide proper information respecting his or her condition, *fails to furnish objective medical documentation of such condition* or fails to follow a medically credible treatment plan, . . . Plan benefits are not payable" (emphasis added).

Bell also contends that the Plan improperly based its decision on Bell's unusually long recovery time and that the Plan arbitrarily discontinued benefits when the evidence showed no change in Bell's condition. The record does not support these arguments. First, nothing in the record suggests that the Plan relied on Bell's unusually long recovery time when it rendered its decisions. The portions of the record to which Bell cites are most plausibly read to mean that the Plan found the evidence that Bell submitted insufficient to support a finding of disability for the period following denial.[12] Second, the evidence regarding Bell's condition changed after the approval date. In particular, Dr. Brown's original treatment notes indicated that Bell had swelling and tenderness indicative of sprains in both hands, and his second submission indicated that Bell was on bed rest. None of the documents submitted after Bell's June 12 denial indicated that Bell's hands were still swollen or sprained, or that Bell was still on bed rest. This apparent improvement in her condition altered her ability to function at work, as swollen hands and bed rest no longer impeded her ability to type or sit.

Finally, Bell argues that the Plan violated its duty under 29 U.S.C. § 1133 to provide notice of the specific reasons for denial. Specifically, Bell faults the Plan for failing to provide written notice of the change in the rationale for its decision–i.e., the change from denial for failure to submit any evidence to denial for failure to provide objective medical documentation. There is some merit to this position. A plan may not, consistent with 29 U.S.C. § 1133(2), "initially deny benefits for

---

[12]For example, Bell notes that the Plan's internal records state that "[m]edical is not supportive of 36 days plus denial." Bell would have us read this to mean that the Plan had determined an acceptable recovery time and that 36 days exceeded it. But a more plausible reading is that, in the Plan's view, the medical documentation Bell submitted did not support a finding of disability for the thirty-six day period from the denial of benefits to the date of Dr. Brown's note.

one reason, and then turn around and deny benefits for an entirely different reason, after an administrative appeal, without affording the claimant an opportunity to respond to the second, determinative reason for the denial of benefits." *Balmert v. Reliance Standard Life Ins. Co.*, 594 F.3d 496, 501 (6th Cir. 2010) (citing *Wenner v. Sun Life Assurance Co. of Can.*, 482 F.3d 878, 882 (6th Cir. 2007)).

Yet a plan need only "substantially comply" with § 1133's notice requirement. *Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 436 (6th Cir. 2006) (citing *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir. 1996)). A plan substantially complies with § 1133 where "claim communications as a whole are sufficient to fulfill the purposes of Section 1133," meaning that they notify the claimant of the reasons for denial and afford her a fair opportunity for review. *Ibid.* (citing *Kent*, 96 F.3d at 807). In this case, the Plan substantially complied with § 1133's notice requirements. Although the Plan's written communications to Bell did not directly state that the Plan had changed the basis of its denial decision, the Plan conveyed this change to Bell through telephonic communications.[13] Additionally, with each notice of denial, the Plan sent Bell a copy of the Plan's appeal procedures, which listed the types of medical evidence and documentation that could support her claim. Bell thus had notice both of the reasons that the Plan refused to reinstate her benefits and of the type of documentation required to support her claim. Further, she had ample opportunity to submit objective medical documentation prior to the final review decision, and ultimately did submit substantial information in response to the Plan's requests. This satisfied the purposes of § 1133.

---

[13]In particular, Plan representatives told Bell that "medical didn't support" her claim and that the Plan required objective information to reinstate benefits.

Because none of the factors listed by Bell compels a conclusion that the Plan's decision was arbitrary and capricious, and because the Plan has offered a reasoned explanation for its finding that Bell was not disabled, we conclude that the district court did not err by granting judgment in favor of the Plan.

**IV**

For the foregoing reasons, we AFFIRM the orders of the district court.

**ALAN E. NORRIS, Circuit Judge, dissenting.** In response to plaintiff's motion to compel discovery, the district court ordered Ameritech Sickness and Accident Disability Benefit Plan ("the Plan") to "provide the procedures used by the third party reviewer and the methods that they follow, including any brochures, booklets, and copies of contracts with the Plan setting forth the obligations of the reviewer on behalf of the Plan." As the Majority recognizes, while the typical ERISA action challenging the denial of benefits does not include extensive discovery, the district court may order it when a plan participant is seeking information "in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." Majority Op. at 9 (quoting *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998)). In seeking discovery, plaintiff hoped to establish that the doctors employed by Network Medical Review failed to follow the Plan's own procedures by not contacting her treating physicians. Had plaintiff successfully established such a breach of the Plan's protocol, she could have argued that the manner in which her claim for benefits was reviewed was fundamentally flawed and that the Plan administrator's decision was therefore arbitrary or capricious.

She was prevented from doing so, however, because counsel for the Plan refused to comply with the district court's discovery order. The reason for this non-compliance is baffling. The discovery order was limited in scope. More importantly, by failing to comply counsel not only left themselves open to sanctions, they also subjected the Plan to a potential finding by the district court that "the matters embraced in the [discovery] order or other designated facts be taken as established for purposes of the action, as the prevailing party claims." Fed.R.Civ.P. 37(b)(2)(A)(i). In short, counsel acted in a manner contrary to the Plan's interest and totally at odds with the spirit of the

Federal Rules of Civil Procedure, which contemplate cooperation among counsel in matters involving discovery so that costly, time-consuming litigation can be avoided. While the district court acted appropriately in sanctioning such behavior, in my view it did not go far enough.

The district court never disavowed the propriety of its discovery order and, by imposing sanctions, it tacitly acknowledged the potential importance of the documents subject to discovery. Yet, in the same order in which it affirmed the sanctions recommended by the magistrate judge, the court granted judgment to the Plan on the merits, concluding the documents subject to discovery would not affect the ultimate disposition of the case. In the absence of the documents themselves, it strikes me that this conclusion was premature. Nowhere in its judgment order does the district court explain why the documents could not affect the outcome under any circumstances. If this were true, then there would have been no need to grant the motion to compel their production in the first place.

In my view, rather than rewarding The Plan for its contumacy, the district court should have enforced its motion to compel prior to ruling on the merits. Its failure to do so constitutes an abuse of the court's discretion. I would therefore vacate the judgment and remand the matter for reconsideration after the documents subject to discovery have been produced.

I respectfully dissent.