NOT RECOMMENDED FOR PUBLICATION
File Name: 13a0282n.06

No. 11-6061

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
*Mar 21, 2013*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| JAMES NEATON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| HARTFORD LIFE AND ACCIDENT | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

**Before: BOGGS** and **WHITE**, Circuit Judges; and **BLACK,** District Judge.*

**BLACK**, District Judge. James Neaton ("Neaton") appeals the district court's grant of judgment on the pleadings in favor of Hartford Life and Accident Insurance Company ("Hartford"). Neaton argues that the district court erred in: (1) substituting the opinion of Hartford's nonexamining medical expert for his treating physician; (2) determining the level of absenteeism that could be accommodated by relying on the opinion of an in-house vocational expert who cited no data; and (3) calculating the average frequency of his surgeries by considering an improper time period, which resulted in an artificially low assumption as to the frequency of his surgeries. We agree. As such, we **REVERSE** the district court's grant of judgment on the pleadings and **AWARD BENEFITS** consistent with this opinion.

* The Honorable Timothy Black, United States District Judge for the Southern District of Ohio, sitting by designation.

## I. BACKGROUND FACTS

Neaton seeks judicial review of the termination of long-term disability ("LTD") benefits pursuant to an ERISA[1] welfare-benefit plan, under which Neaton was covered by virtue of his employment with Navy Federal Credit Union ("Navy Federal"). Neaton ceased work due to a medical condition on September 6, 2007, and was awarded and received LTD benefits under the Plan from December 5, 2007, until benefits were terminated effective July 15, 2008.[2] Neaton argues that Hartford's decision to terminate benefits was arbitrary and capricious.

### A.      Neaton's Claim for LTD Benefits

On his last day of work, September 5, 2007, Neaton had been working for Navy Federal for 32 years. Neaton worked as an LCR Counselor, Navy Federal's term for a debt collector, "recovering outstanding debts, negotiating repayments with att[orneys], maintain[ing] records chronologically[,] and handl[ing] settlement offers."[3]

Neaton was diagnosed with Gorlin's Syndrome in the fourth grade. Gorlin's is a rare genetic defect that causes Neaton to develop numerous basal-cell carcinomas (skin cancers), cysts, and other lesions. Those cancers, unlike most basal-cell carcinomas, are prone to metastasizing and are

---

[1] Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

[2] It is unreasonable to find that a claimant ceases to be disabled absent a change in the underlying medical condition. *See Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840 (8th Cir. 2001) (overturning plan administrator's termination of benefits where nothing in record demonstrated medical improvement or change in circumstances to warrant termination of benefits).

[3] Neaton was highly compensated, earning $16,432.62 ($4,099.92 in salary plus $12,332.80 in commissions) per month on average prior to disability.

removed by one of two methods: curettage and cautery ("scooping or scraping" and "burning")[4] or

Moh's surgeries.[5]  Moh's surgeries are necessary when the cancers have progressed too far to be

removed by curettage and cautery and are more invasive, sometimes requiring skin grafts.

The day after his last day of work, September 6, 2007, Neaton was scheduled for a curettage

and cautery procedure to remove fourteen skin lesions.  Neaton claimed he could not work because

he could no longer "handle" the number of surgeries and recovery periods.

Through the Plan, Neaton was insured against long-term disability by Hartford.[6]  Believing

that he was now unable to work, Neaton filed for LTD benefits.  Neaton's dermatologist, Jeffrey

---

[4] Neaton described the curettage and cautery procedures as "sometimes involv[ing] fifteen or twenty cancer lesions removed during one procedure.  This would cause tremendous pain, stress and anxiety.  I would leave the doctor office soaked in sweat.  Even these surgeries were very painful and made it difficult to sleep."

[5] Neaton described the effects of the Moh's surgeries:

The day after a Mohs surgery there is tremendous swelling and a lot of pain which causes me to take pain pills.  By the second day the pain and swelling are so bad I can not sleep or function at all.  If the surgery was on my head or face by the third day my eyes swell shut for about five days.
. . .
The pain is bad enough to require pain medication that affects my functioning.  Also, because of pain and the discomfort of the large bandaging, it makes it impossible to sleep.
. . .
The Mohs surgeries I have are so large that the recuperation time can go weeks and sometimes months.  Right now I am still feeling effects of the past 3 surgeries which were months ago.

[6] The parties do not dispute the terms of the Plan, which contained a fairly common provision defining disability during the first twelve months after the elimination period as the insured's inability to perform the "material and substantial duties" of his regular occupation and, after that twelve months, as the inability to perform any occupation. Material and substantial duties are those "which cannot be reasonably omitted or altered."  The parties' dispute turns on a factual issue regarding whether Neaton was capable of performing his former job.

Schuldenfrei, M.D., provided a letter describing the treatment and limiting Neaton to "no work."[7] Specifically, Dr. Schuldenfrei explained that Neaton should avoid exposure to sunlight and fluorescent lighting.

Because Neaton had been suffering from Gorlin's for some time, Hartford contacted him in order to ascertain the "reason for stopping work now." Neaton informed Hartford he needed Moh's surgeries "every month" because cancer was coming back in places it had previously been removed.[8] Hartford was aware, as early as November 2007, that Gorlin's syndrome is progressive: as patients age, the number of skin cancers increase and are made worse by exposure to sunlight. Because Neaton was commuting an hour to work each day, presumably with the attendant exposure to sunlight, a Hartford claims examiner recommended that his LTD claim be approved.

That recommendation was "deferred" pending the receipt of updated treatment notes from Dr. Schuldenfrei, which stated that Neaton underwent another curettage and cautery procedure on November 1, 2007, and was to follow up with Dr. Schuldenfrei every month. Hartford decided to wait for information regarding whether Neaton's condition could be accommodated before making a benefits decision. On December 10, 2007, Hartford interviewed Neaton to inquire about the effect of his surgeries on his ability to work. Neaton told the interviewer he was scheduled for yet another

[7] Hartford maintains that Neaton requested that Dr. Schuldenfrei limit him to "no work." (Doc. 26 at 5). Neaton acknowledged that he told Dr. Schuldenfrei he could not work anymore, but instead of providing a "no work" letter, Dr. Schuldenfrei advised Neaton to seek counseling. Neaton was still working when those counseling sessions began.

[8] Neaton also explained that his "nerves [we]re shot" due to embarrassment about his physical appearance and anger at his boss, who had accused him of having pornography on his computer in some sort of "joke." Hartford concluded Neaton did not have any work restrictions resulting from a mental condition, but noted that his physical condition might well cause psychological symptoms. Neaton does not attribute his disability to a mental condition in his motion for judgment on the pleadings.

surgery on December 13, 2007, and that he was "needing more s[urgeries]" as his condition progressed. Neaton also explained that he needed "time to recoup" after surgeries because of his "nerves," embarrassment, depression, facial swelling, pain medication, bandaging, and bleeding. Neaton appeared to attribute some of his work limitations to difficulties associated with physically attending work rather than performing work tasks. For example, Neaton was afraid to drive because of sun exposure, and he believed coworkers were talking about his appearance. When the interviewer broached the possibility of Neaton working from home, Neaton did not offer any reason that he could not, but stated that he did not believe his employer would allow it.

B.      Initial Claim Approval

On December 19, 2007, Hartford approved Neaton's claim for LTD benefits. Although Hartford was still "working on accommodations for [Neaton] to [return to work] either in a special room or at home," Hartford determined that "it [wa]s reasonable that [he] would be unable to function in a regular environment with sunlight and fluorescent lighting." Hartford noted that "each exposure" to sunlight or fluorescent lighting created a risk for additional skin cancers, as well as "organ involvement" as the disease progressed. Hartford's analysis suggested that limiting sun exposure would reduce the recurrence of, but "w[ould] not prevent all" of, Neaton's skin cancers. Hartford concluded that Dr. Schuldenfrei's limitations and restrictions were "supported." A month later, on January 23, 2008, Neaton underwent an eight-hour surgery to remove a lesion from his ear. Neaton called it "the worst s[urgery] of his life" and noted it was the first time he had needed a skin graft.

## C.    Continued Review of Neaton's Claim

In March 2008, Navy Federal informed Hartford it was willing to consider whether Neaton could return to work with appropriate accommodations. To "update" its assessment of Neaton's ability to work, Hartford contacted both Neaton and Dr. Schuldenfrei for more information. Neaton reported he was still "tender" from his January surgery and that he was scheduled for another surgery on both ears and his scalp. Neaton stated he needed three to four months to recover from a Moh's surgery, but only one month to recover from a "regular" surgery. Dr. Schuldenfrei reported that he was treating Neaton "frequently" and that on a typical visit, he discovered between five and fifty new skin cancers. Dr. Schuldenfrei opined that Neaton "could work in his home environment," provided, of course, that he was protected from ultraviolet light. He also reported that Neaton's recovery time "varie[d] greatly," from several days for "superficial" surgeries and "a week or more" for Moh's surgeries. Dr. Schuldenfrei noted that, during the previous two years, Neaton's cancers had become more aggressive, necessitating more Moh's surgeries. Dr. Schuldenfrei anticipated that monthly surgeries would be required "for the foreseeable future."

On May 1, 2008, Hartford began an employability analysis review in an attempt to "match" Neaton to other positions he could perform with his restrictions. At first, Hartford found positions available in which Neaton could earn a comparable salary. Later that same day, however, Navy Federal agreed to accommodate Neaton's condition by allowing him to perform his former job at home. Hartford also forwarded Neaton's file to Rehabilitation and Re-Employment, Inc., for an occupational-research survey. According to the results, which were received on May 22, 2008, the duties of Neaton's former job could be performed from home. The report identified five suitable

full-time positions: Loan Counselor, Collections/Sales Representative, Collections Account Representative, Customer Service Agent, and Telemarketer.

On May 2, 2008, a note appeared in Neaton's file stating that Hartford intended to conduct a "peer review" of Dr. Schuldenfrei's restrictions in order to "clarify" the impact of fluorescent lighting on Neaton's condition. During the peer-review process, on May 14th, Neaton underwent another Moh's surgery. On May 29th, the peer review was completed by Seth Kates, M.D., a board-certified dermatologist. Dr. Kates attempted to contact Dr. Schuldenfrei without success, so he completed the review without the benefit of Dr. Schuldenfrei's input. Dr. Kates opined that "the effect of fluorescent light [wa]s minimal" and that Neaton could work indoors with protective clothing and sunscreen. Hartford decided not to change Neaton's status without allowing Dr. Schuldenfrei to comment on Dr. Kates's report, so Hartford forwarded that report to him. In June, before Hartford received Dr. Schuldenfrei's comments, Neaton underwent yet another Moh's surgery.

Dr. Schuldenfrei disagreed with Dr. Kates's assessment. Specifically, he noted that Dr. Kates's assumptions seemed to be based on research of "common" basal cell carcinomas, not Gorlin's syndrome. Dr. Schuldenfrei continued, "[i]t is my strong opinion that unless your consultant can cite specific references on patients with this specific syndrome to the contrary, it must be assumed that patients with Nevoid Basal Cell Carcinoma Syndrome require life long limitation of exposure to ultraviolet light from sun and from other sources, including fluorescent lighting." Dr. Schuldenfrei based his recommendation on a consultation with "a leading Dermatologist at the National Institutes of Health who has treated many patients with [Gorlin's] syndrome." Dr. Kates was given the opportunity to respond, and he opined that while Dr. Schuldenfrei's statement was

"factually correct," it was "practically incorrect" because ultraviolet radiation from fluorescent bulbs "is, although real, extremely limited and probably not clinically significant compared to other sources of ultraviolet light." According to Dr. Kates, Neaton would continue to develop skin cancers "regardless" of his exposure to fluorescent lighting. Dr. Kates stated his opinion was based on his three patients with the same condition and on the "current literature." Neaton also weighed in on the debate, stating that his cancers, which were on his ears and head, were located "exactly" where he was exposed to fluorescent lighting at work. Neaton also informed Hartford that he had undergone another curettage and cautery procedure on July 10, 2008.

### D.     Termination of Benefits

On July 15, 2008, based on a review of Neaton's file, a Hartford employee concluded that Neaton was no longer eligible for disability benefits because he was able to perform his former job, a sedentary, indoor occupation. That employee relied on Dr. Kates's opinion that Neaton "should be able to work in an indoor environment with controlled light exposure taking adequate precautions." Hartford terminated Neaton's benefits the following day, explaining that Neaton could perform his job indoors with controlled light exposure or from his home. Neaton complained that his condition was worse at the time of termination than it had been when his benefits were approved, and he expressed his intention to file an appeal. The next month, Neaton underwent a Moh's surgery and a curettage and cautery procedure. Moh's surgeries were also performed in October 2008 and January 2009.

During the pendency of the appeal, Hartford forwarded Neaton's file to Dr. Vesna Petronic-Rosic, a board-certified dermatologist, for another peer review. Dr. Petronic-Rosic reviewed Neaton's medical records and pictures of his lesions and surgeries, and agreed with Dr.

Schuldenfrei's assessment. She stated that Neaton would "most certainly" require "multiple surgeries." Further, she stated that "if [Neaton] is to have surgeries once a month or every 2 months, a week off would be reasonable to enable adequate healing and obviate the need for bulky bandages to be worn to work." Hartford asked Dr. Petronic-Rosic whether this recovery time was necessary due to "physical limitations" or "just due to [Neaton] wearing bandages." Dr. Petronic-Rosic responded that "[i]f [Neaton] were working from home he would need approximately 3 to 4 days off for reasonable healing." She explained that any bending, twisting, or stretching the affected areas during the healing period might cause bleeding and wound dehiscence.

### E.    Final Appeal Decision

In February 2009, after reassessing Neaton's occupational prospects, Hartford rendered its final appeal decision upholding the termination of Neaton's LTD benefits. Explaining the decision, Hartford marshaled three pieces of evidence. First, Hartford relied on Dr. Petronic-Rosic's opinion that Neaton would need three to four days of recovery after each surgery "for reasonable healing" if he were working from home. Second, Hartford estimated that Neaton would require surgery "on a 2 month or greater basis." To reach that estimate, Hartford noted that during the 16-month period from May 2007 through October 2008, Neaton underwent six surgeries.[9] And third, Hartford relied

---

[9] A summary of Neaton's treatments:

| Date | Type* | Citation |
|------|-------|----------|
| January 2009 | Moh's | R. 17-9 at 196-203 |
| October 2008 | Moh's | R. 17-9 at 257-62 |
| August 2008 | Moh's and C&C | R. 17-9 at 234, 263-71 |
| July 2008 | C&C | R. 17-9 at 361 |
| June 2008 | Moh's | R. 17-9 at 272-75 |
| May 2008 | Moh's | R. 17-9 at 276-79 |
| March 2008 | C&C | R. 17-9 at 237 |
| January 2008 | Moh's | R. 17-9 at 280-86 |

on the results of an occupational research survey to conclude that Neaton's job could be performed from home. Based on those assumptions, a Vocational Clinical Case Manager determined:

> It is reasonable, given the common practice of employers, the sedentary nature of [Neaton's] occupation, and that the occupations identified can be full-filled [sic] by working from home, [to find that Neaton] would reasonably be accommodated for a recovery period of 3 to 4 days bi-monthly, with additional allowances that could include Saturday and Sunday as recovery days.

Hartford adopted this analysis and concluded Neaton was capable of performing the duties of his own occupation in a home environment. With his administrative appeals exhausted, Neaton filed suit.

## II. STANDARD OF REVIEW

This case concerns the determination of benefits under a plan governed by ERISA. The Supreme Court and this Circuit have held that a district court should review a plan administrator's determination of benefits under an ERISA plan *de novo* unless the plan expressly gives the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms, in which case it should employ the arbitrary and capricious standard. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-12 (1989); *see also Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998). The "arbitrary and capricious" standard applies in this case because the Policy gives the administrator discretionary authority by requiring employees

---

| | | |
|---|---|---|
| December 2007 | C&C | R. 17-9 at 485 |
| November 2007 | C&C | R. 17-9 at 240 |
| September 2007 | C&C | R. 17-9 at 243 |
| May 2007 | Moh's | R. 17-9 at 246, 287-89 |
| April 2007 | C&C | R. 17-9 at 247 |
| October 2006 | C&C | R. 17-9 at 249 |
| February 2006 | C&C | R. 17-9 at 251 |

*Curettage and cautery is abbreviated "C&C."

-10-

to provide Hartford with "satisfactory" proof of disability to receive benefits. *Cf. Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380-81 (6th Cir. 1996).

In reviewing a district court's application of either one of these standards, however, this court *always* applies a *de novo* standard of review. *Killian*, 152 F.3d at 520. Thus, the ultimate inquiry in this case calls for a *de novo* review of the district court's finding that there was no "genuine issue of material fact whether the insurance company's decision to deny benefits was arbitrary or capricious." *Id*. An administrator's decision is not arbitrary and capricious if the outcome may be supported by a reasoned explanation based on the evidence. *Kalish v. Liberty Mut*., 419 F.3d 501, 506 (6th Cir. 2005).[10] Any alleged conflicts of interest should also be considered as part of the arbitrary-and-capricious analysis.[11] *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006).

### III. ANALYSIS

Neaton alleges that the frequency of surgeries and their attendant recovery times would cause him to miss so much work that he would be effectively prevented from performing any occupation.

---

[10] Courts should not be mere rubber stamps that uphold an administrator's decision whenever the plan was able to find a single piece of evidence – no matter how obscure or untrustworthy – to support a denial of a claim for ERISA benefits. *McDonald v. W.- S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). Further, courts should not uphold a termination when there is an absence of reasoning in the record to support it. *Id.*

[11] A conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits. *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 299 (6th Cir. 2005). In this case, because Hartford maintains such a dual role, "the potential for self-interested decision-making is evident." *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n.4 (6th Cir. 2000). The reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision. *Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 606 n.2 (6th Cir. 2004). "[P]hysicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and preserve their own consulting arrangements." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (internal quotations omitted).

Hartford relied on the opinion of a non-examining medical consultant to find a shorter recovery period and relied on the opinion of an in-house vocational expert to conclude that this level of absenteeism could be tolerated by a prospective employer. Neaton argues that neither the reliance on the non-examining medical consultant nor the reliance on the vocational expert was justified.

### A. Neaton's Recovery Time

Both Neaton and his treating dermatologist, Dr. Schuldenfrei, claim that it takes Neaton "a week or more" to recover following a Moh's procedure. With respect to recovery time, Neaton stated:

> If the surgery was on my head or face by the third day my eyes swell shut for about five days . . . the Mohs surgeries I have are so large that the recuperation time can go weeks and sometime months. Right now I am still feeling effects of the past 3 surgeries which were months ago.

Treating dermatologist Dr. Schuldenfrei agreed:

> The recovery time for Mr. Neaton following surgery of his skin cancers varies greatly. In the distant past, his lesions were less numerous and often very superficial, necessitating only several days for recovery. Over the past 2 years, however, his lesions have become increasingly aggressive (larger and deeper), necessitating more complicated surgery (Mohs surgical technique and plastic surgical reconstruction), with recovery times of a week or more.

Hartford's non-examining medical consultant, Dr. Petronic-Rosic, agreed in substantial part that "the multiple surgeries this claimant will most certainly need require approximately one week for reasonable recovery. Therefore, if he is to have surgeries once a month or every 2 months, a week off would be reasonable to enable adequate healing and obviate the need for bulky bandages to be able to work." However, if Neaton were working from home, Dr. Petronic-Rosic opined that he would only require three to four days off work following surgery. Hartford adopted this finding without consulting Dr. Schuldenfrei or Neaton.

-12-

Dr. Petronic-Rosic did not examine Neaton. This is a relevant factor to consider, because a patient's recovery time following surgery is variable and depends in part on the extent of a patient's pain. Accordingly, the length of the patient's recovery is in large part a credibility determination. *Cont'l Cas. Co.*, 450 F.3d at 263-64 (holding that it was improper to rely on non-examining medical consultant to determine severity and credibility of pain). While it is not per se improper to rely on the opinion of a non-examining medical consultant, whether a doctor has physically examined the claimant is a factor that may be considered in determining whether a plan administrator acted arbitrarily in giving greater weight to the opinion of its consulting physician. *Kalish*, 419 F.3d at 508. The plan administrator's failure to require a physical examination "may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). Indeed, the lack of a physical examination may be particularly inadequate where, as here, the file reviewer makes critical credibility determinations. *Id.* at 297, n.6.

This Circuit has repeatedly criticized the rejection of the opinion of a treating physician that is consistent with the medical record, in favor of non-examining file reviewers. *See, e.g.*, *Kalish*, 419 F.3d at 509-510; *Calvert*, 409 F.3d at 297; *Cont'l Cas. Co.*, 450 F.3d at 263.[12] The obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald*, 347 F.3d at 172.

_____

[12] *Moon v. UNUM Provident Corp.*, 405 F.3d 373, 381-82 (6th Cir. 2005) ("[W]hen a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism.").

In addition to the well-settled principle that a treating physician's opinion is not entitled to any special deference under ERISA, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), Hartford maintains that Neaton cannot show that it disregarded the opinion of Dr. Schuldenfrei in favor of the opinion of Dr. Petronic-Rosic, a board-certified dermatologist with a sub-specialty in dermatose pathology, who provided an independent peer review of Neaton's medical records. Specifically, Hartford points out that, because the Administrative Record contains no evidence that Dr. Schuldenfrei addressed the number of recovery days that Neaton would require if working from home, the argument that Hartford "arbitrarily. . . substitut[ed] the opinion of its hired, non-examining medical expert for that of Mr. Neaton's physician as to the reasonable recovery time following a surgery" is not accurate. (Appellant's Br. at 27). While we do not disagree with this analysis, Hartford misses the point. Hartford failed to obtain Dr. Schuldenfrei's opinion with respect to Neaton's recovery time if he were to work from home. If in fact the plan administrator were performing an appropriate review, he would have certainly obtained such information from the treating physician before proceeding to a final determination.

Although the district court did not wholly disregard the opinion of Neaton's treating physician, a court should not uphold a termination when there is an absence of reasoning in the record to support it. *McDonald*, 347 F.3d at 172. The number of days Neaton required to recover from a Moh's procedure if working from home is in large part a credibility determination. *See Calvert*, 409 F.3d at 297. Hartford's exclusive reliance on the opinion of a physician who never physically examined Neaton, or even spoke to him about his recovery process, calls into question the quantity and quality of the medical evidence and opinion.

**B.      Frequency of Neaton's Surgeries**

The vocational expert reasoned that because Neaton had six Moh's surgeries between May 30, 2007, and October 21, 2008, or six Moh's surgeries in one year, four months, and twenty-one days, that he required surgical intervention (and time off for recovery) less often than once every two months and that absenteeism at that rate could be accommodated.

However, this analysis averages Neaton's surgeries over a period of time that includes several months (May-September 2007) when he was not disabled and was in fact still working. It also ignores that Neaton's surgeries were increasing in frequency throughout 2008. Additionally, the vocational expert only took the Moh's procedures into account and ignored the curettage and cautery procedures.

Neaton indicated that the curettage and cautery procedures "could sometimes involve fifteen or twenty cancer lesions removed during one procedure. This would cause tremendous pain, stress and anxiety. I would leave the doctor office soaked in sweat. Even these surgeries were very painful and made it difficult to sleep." In fact, it was a curettage and cautery procedure performed on September 6, 2007, that prompted Neaton to cease work.

Neaton alleges that over the sixteen months from September 2007 (when he ceased work) until January 2009 (the last medical record in the claim file), he required twelve total surgeries: six Moh's procedures and six curettage and cautery procedures.[13] Assuming recovery time of "a week or more" following a Moh's surgery as estimated by Dr. Schuldenfrei and recovery time of just a day

---

[13]  Neaton required Moh's surgeries on January 23, 2008, May 14, 2008, June 11, 2008, August 26, 2008, October 21, 2008, and January 6, 2009. He also required curettage and cautery procedures on September 6, 2007, November 1, 2007, December 13, 2007, March 6, 2008, July 2008, and August 28, 2008.

or two following a curettage and cautery procedure, Neaton could reasonably miss over thirty-five days of work during that time period. Even at the three-to-four day Moh's surgery recovery suggested by Dr. Petronic-Rosic, Neaton could reasonably miss approximately thirty days of work or 1.88 days per month.

Hartford argues that the vocational analyst scrutinized Neaton's surgical history from May 2007 to October 2008, taking "a long exposure rather than a snapshot" and considering a period both before and after Hartford ceased paying benefits to Neaton in an effort "[t]o gain a more complete picture of [Neaton's] condition." Hartford further suggests that if Neaton were to schedule his surgeries to fall on Thursdays or Fridays, he would miss only one to two days of work bi-monthly during the recovery process.[14]

We disagree. Neaton made a claim for disability because the surgeries were becoming too frequent for him to maintain job performance. Considering only his medical history prior to his last day of work does not accurately portray the reality of his disability:

- September 2007 (the date Neaton ceased work) - January 2009 (sixteen months): six Moh's procedures plus six curettage and cautery procedures.

- January 2008-January 2009 (twelve months): six Moh's procedures plus three curettage and cautery procedures;

- May 2008-January 2009 (eight months): five Moh's surgeries plus two curettage and cautery procedures.

This timeline indicates that the frequency of Neaton's surgeries increased throughout 2008.

---

[14] This statement assumes that Neaton has some control over the scheduling of his surgeries, but there is no evidence that is in fact the case. Moreover, Neaton noted at oral argument that none of his surgeries were scheduled on Friday.

A vocaitonal expert's opinion that a claimant can perform certain jobs is only substantial evidence to the extent that the vocational expert had a complete, accurate understanding of the claimant's restrictions and limitations. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994). The vocational expert's opinion here, based upon calculating the average frequency of Neaton's surgeries over a timeline beginning prior to the time he claimed to be disabled, results in an artificially low assumption as to the frequency of his surgeries and work absences, and does not constitute substantial evidence to support Hartford's denial of benefits. Moreover, regardless of which time period the Court considers, any one of the periods shows a number of absences greater than what government statistics suggest could be accommodated. (*See infra* at Section III.C).

## C. Level of Absenteeism

Hartford turned to an in-house vocational specialist to determine whether Neaton's rate of absenteeism could be accommodated. The vocational specialist opined: "It is reasonable given the common practice of employers, the sedentary nature of the claimant's occupation, and that the occupations identified can be full-filled [*sic*] by working from home, the claimant would reasonably be accommodated for a recovery period of 3 to 4 days bi-monthly." The vocational specialist cited no evidence or data about allowable rates of absenteeism beyond "the common practice of employers."

A fiduciary has an obligation to evaluate its hired expert's opinion and to make certain that reliance on the expert's advice is justified under the circumstances. *Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 841 (6th Cir. 2003).[15]

---

[15] A fiduciary's duty to investigate extends to vocational questions. "Just as a plan administrator must make some inquiry into the nature and transferability of a claimant's job skills, a plan administrator must make some inquiry into whether the jobs selected are ones that the

> A determination whether a fiduciary's reliance on an expert advisor is justified is informed by many factors, including the expert's reputation and experience, the extensiveness and thoroughness of the  expert's investigation, whether the expert's opinion is supported by relevant material, and whether the expert's methods and assumptions are appropriate to the decision at hand.

*Id*. at 841-43.  Moreover, conclusory medical and vocational opinions that fail to provide evidence or reasoning to support the conclusions are insufficient to support a denial of benefits.  *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 618-19 (6th Cir. 2006).  However, "reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly."  *Calvert*, 409 F.3d at 295.

Hartford contends that the opinion was not conclusory because, in the analysis, the vocational analyst referred to Neaton's job description, the job's sedentary exertional level, and a labor market survey finding that the job could be performed from home.  Notably, these references are silent with respect to an acceptable rate of absenteeism, stating only that the occupation could be performed from home.

Average paid sick leave for "professional, technical and related employees" in 1996 was 8.5 days for individuals with one year of service, and up to 10.6 days for individuals with over 25 years of service.[16]  A subsequent March 2010 publication from the Bureau of Labor Statistics shows that

claimant can reasonably perform in light of specific disabilities."  *Brooking v. Hartford Life & Accident Ins. Co.*, 167 F. App'x 544, 549 (6th Cir. 2006).

[16]  http://www.bls.gov/news.release/ebs.t05.htm (last visited October 17, 2012).  Hartford complains that these government statistics are not part of the administrative record and therefore cannot be considered in this court's analysis.  However, Federal Rule of Evidence 201 states that a court may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  Courts commonly consult reference sources in order to better understand matters that are not typically common knowledge.  *Doss v. Barnhart*, 247 F. Supp. 2d 1254, 1259 (N.D. Ala. 2003); s*ee, e.g.*, *Brooking*, 167 F. App'x at 549 n.5 (claimant sued plan administrator for denying her LTD benefits, and the

full time workers with one year of service are now, on average, allowed 8 days of paid sick leave.[17]

Even accepting the lowest calculation of recovery time, Neaton would miss 3 to 4 days after a Moh's surgery and just 1-2 days following a curettage and cautery. This would mean that Neaton would have missed 20-28 days for the six Moh's procedures and two curettage and cautery procedures from January 2008-January 2009 (1.7-2.3 days per month).[18] Neaton would have missed 16-22 days over just eight months from May 2008-January 2009 (2-2.8 days per month). At the most basic level, Hartford could have easily made an inquiry to Navy Federal regarding whether this degree of absenteeism was acceptable, but it did not. Accordingly, the record is devoid of any data regarding absenteeism at Navy Federal.

Neaton claims that Hartford acted arbitrarily by relying on the opinion of an in-house vocational expert who cited no data, conducted no labor market investigation, and instead cited

---

court took judicial notice of 20 C.F.R § 220.132, which defines "sedentary" and "light work" pursuant to Fed. R. Evid. 201); *Sevens v. Metro. Life Ins. Co.*, 190 F. App'x 429, 436 n.7 (6th Cir. 2006) (recognizing that courts may take judicial notice of the Dictionary of Occupational Titles).

Even if this court held that the Labor Department statistics were not admissible, there is a significant lack of evidence to support Hartford's denial of benefits where the record is silent as to Navy Federal's acceptable rate of absenteeism.

[17] http://www.bls.gov/opub/perspectives/program_perspectives_vol2_issue2.pdf. (Last visited on October 17, 2012).

[18] In *Douglas v. Bowen*, a social-security disability case, the vocational expert conceded that "if [Douglas] had an absentee rate in excess of one or two days a month, he'd not be able to work in any" of the sedentary or light jobs described by the vocational expert. 836 F.2d 392, 396 (8th Cir. 1987). This finding supports Neaton's argument, as the record evidence shows that he would miss more than one or two days a month. *Id.*

-19-

solely to "the common practice of employers" in ascertaining the degree of absenteeism that could be accommodated in Mr. Neaton's occupation.[19]

Hartford argues that "the common practice of employers" is not conclusory, but a direct reference to evidence in the claim file that Navy Federal was willing to accommodate and facilitate Neaton's return to work. ("[I]t was determined by the employer that the employer would offer the option to the employee for working out of his house."). However, the fact that Neaton could work from home is insufficient to support Hartford's ambiguous statement that missing work 3-4 days bi-monthly was within "the common practice of employers." Hartford fails to reference evidence in the claim file that Navy Federal was willing to accommodate Neaton's absenteeism.[20]

An administrator acts arbitrarily and capriciously when it "engages in a 'selective review of the administrative record' to justify a decision to terminate coverage." *Metro Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (quoting *Moon*, 405 F.3d at 381). There is not "a reasoned explanation, based on the evidence, for [the] particular outcome [in this case]." *Shields v. Reader's Digest Ass'n, Inc.,* 331 F.3d 536, 541 (6th Cir. 2003). Specifically, Hartford: (1) failed to provide supported evidence that, if working from home, Neaton could recover from a Moh's procedure in 3-4 days; (2) failed to accurately calculate the frequency of Neaton's surgeries and work absences; and (3) relied on the opinion of an in-house vocational expert who cited no evidence in

---

[19] At oral argument Neaton maintained that had he known Hartford would adopt this finding and had he been given the opportunity before the issuance of the final denial, he would have submitted data regarding acceptable rates of absenteeism.

[20] Simply because an employee works from home does not mean that the employee is not "absent" when a medical issue prevents the employee from working. To withstand review, the insurer's decision must result from a "deliberate principled reasoning process." *Killian*, 152 F.3d at 520. Hartford cannot have completed a deliberate, principled, reasoning process as to Neaton's ability to work if it did not even consider Navy Federal's policy on absenteeism.

claiming that Navy Federal could accommodate Neaton's high rates of absenteeism. Accordingly, the court holds that the termination of Neaton's LTD benefits was arbitrary and capricious.[21]

This leaves us with the question of remedy. "In cases such as these, courts may either award benefits to the claimant or remand to the plan administrator." *Elliott*, 473 F.3d at 621. Where the decision to terminate LTD benefits was arbitrary and capricious, the appropriate remedy is reinstatement of benefits. *See Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 674-75 (6th Cir. 2006); *Evans v. UnumProvident Corp.*, 434 F.3d 866, 880 (6th Cir. 2006); *McDonald*, 347 F.3d at 166 (affirming district court's order reinstating benefits after finding that "Western-Southern's decision to terminate McDonald's LTD benefits was arbitrary and capricious because Western-Southern could not offer a reasoned explanation, based upon the evidence in the administrative record, for finding that McDonald was able to engage in gainful employment and, thereby, rendering him ineligible for LTD benefits under the plan.").

While Hartford may subsequently conclude, after engaging in a proper review of Neaton's file, that Neaton's expected rate of absenteeism does not warrant further long-term disability benefits, it does not alter the fact that Neaton was originally found disabled and was entitled to continue receiving benefits until Hartford offered a "deliberate principled" reasoned decision for terminating those benefits. For example, in *Houston v. Unum Life Insurance Co. of America*, the court considered a procedural ERISA violation under 29 U.S.C. § 1133 and observed:

> For violations of § 1133, reversal and remand to the district court or to the plan administrator for full and fair review is ordinarily appropriate. *Marks*, 342 F.3d at

---

[21] "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).

461 (citing *VanderKlok v. Provident Life & Accident Ins. Co.*, 956 F.2d 610, 619 (6th Cir. 1992)). Where, as here, an insurer's final determination is also arbitrary and capricious, the court has discretion to fashion an appropriate remedy. While this circuit has not adopted a categorical rule, it has noted that, a "retroactive award is usually proper when [the] claimant had benefits and lost them,"while "remand is appropriate when a decision-maker fails to make adequate findings or fails to provide [] adequate reasoning." *Elliott*, 473 F.3d at 622 (quoting *Buffonge v. Prudential Ins. Co. of America*, 426 F.3d 20, 31 (1st Cir. 2005) (internal citation omitted)).

246 F. App'x 293, 303 (6th Cir. 2007).

Accordingly, because (1) Hartford previously determined that Neaton was entitled to continued long-term benefits and (2) Neaton presented objective evidence of ongoing disability based on the frequency of his surgeries and the restrictions prescribed by his doctor, we conclude that Neaton remains presumptively entitled to the continuation of his previously awarded long-term disability benefits. *See, e.g.*, *id.* A retroactive award of long-term disability benefits wrongfully withheld and reinstatement of Neaton's long-term disability payments is the appropriate remedy in this case. *Id.*

## IV. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's grant of judgment on the pleadings and **AWARD BENEFITS** consistent with this opinion.