NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0238n.06

Case No. 15-5801

**FILED**
May 04, 2016
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| YULUNDA KAREN MCALISTER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| LIBERTY LIFE ASSURANCE COMPANY | ) | KENTUCKY |
| OF BOSTON, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

_____

**Before: KEITH, McKEAGUE, and KETHLEDGE, Circuit Judges.**

**DAMON J. KEITH, Circuit Judge.** Plaintiff Yulunda Karen McAlister worked at Allstate Insurance Company where she was enrolled in a long-term disability ("LTD") insurance coverage plan ("Policy") provided by Defendant Liberty Life Assurance Company of Boston ("Liberty"). McAlister sought LTD benefits under the policy for a disability, which she received. Liberty viewed McAlister's disability as a mental illness, and because of the 24-month limitation on benefits for "mental illnesses," Liberty discontinued her benefits after two years. After exhausting her administrative appeals, McAlister sued Liberty in district court under section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking continuation of those benefits until her disability ends.

McAlister argued that the limitation provision does not apply to mental illnesses that have a so-called "organic" cause, and that her mental illness has such a cause. Although it afforded McAlister the benefit of this argument, the district court nonetheless entered judgment in favor of Liberty, reasoning that Liberty's decision was not arbitrary and capricious. We agree with this reasoning and so **AFFIRM** the district court's decision.

I.        **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

McAlister was employed at Allstate Insurance Company ("Allstate"). Appellant Br. 7. She was enrolled in short-term disability ("STD") and LTD insurance coverage. *Id.* Below are the following relevant provisions of the Policy:

> Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding. AR 36.

> Mental illness means a psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) regardless of the underlying cause of the Mental Illness. If the DSM is discontinued, Liberty will use the replacement chosen or published by the American Psychiatric Association. AR 9 (hereinafter, "Mental Illness Provision").

> The benefit for Disability due to Mental Illness will not exceed a period of 24 months of Monthly Benefit payments while the Covered Person is insured under this policy. AR 21.

**1. McAlister's medical history and Liberty's various benefit determinations.**

*A. McAlister applies for disability benefits.*

McAlister ended work at Allstate on March 26, 2010 because of a disability. *Id.* at 1060; *see* Appellant Br. 8. McAlister applied for STD benefits under Allstate's STD plan for which Liberty is the plan administrator. *See* AR 1022. To evaluate McAlister's claim, Liberty requested proof of the disability. *Id.*

In a "Restrictions Form" filled out on June 21, 2010, McAlister's treating psychiatrist, Angela M. Burt, MD, indicated that McAlister was, among other things, "currently frequently suicidal," and "depressed." AR 1021. In her May 2010 progress notes, Dr. Burt listed her impression of McAlister's condition as "MDD, severe recurrent."[1] *Id.* at 1016–17. Jessie Singleton, MSW, at Gulf Oaks Psychiatric Services, provided a treatment plan review. AR 1004. In those notes, Singleton states: "[Patient] continues to report depressive episodes & thoughts of suicide. [Patient] also reports extreme outbursts of anger . . . reports low energy, motivation, poor concentration—tingling [in] head." *Id.*

On July 30, 2010, Liberty approved McAlister for STD benefits through August 12, 2010, and for LTD benefits beginning on August 13, 2010. AR 990. Liberty also advised McAlister that the LTD benefits "may be payable up to a maximum of 24 months, or August 11, 2012." AR 983.

*B. Liberty asks for updated medical records.*

Liberty continued to ask for, and later received, updated medical information from Dr. Burt and others involved with McAlister's treatment. *See* AR. 840–46. McAlister had been admitted in the IOP ("Intensive Outpatient Program") at Gulf Oaks Psychiatric Services on April

---

[1] According to Liberty, MDD is an abbreviation for Major Depressive Disorder. Appellee Br. 6.

8, 2010 and was discharged on January 12, 2011. AR 844–46. After McAlister's discharge, on January 14, 2011, Singleton noted that McAlister suffered from, among other things, major depressive disorder and borderline personality disorder. AR. 844.

In response to a letter from a Liberty Consulting Physician, Dr. Burt noted, among other things, that McAlister still suffered from "Major Depression, Recurrence Severe as well as Borderline Personality Disorder . . . ." AR 817. McAlister's symptoms included "rage episodes and intermittent suicide ideation." *Id.*

## C. *Liberty denies continuation of LTD benefits, and McAlister appeals the denial.*

On July 26, 2011, Liberty notified McAlister that her LTD benefits would be terminated effective July 27, 2011. AR 666–69. Relying in part on the reports of certain peer reviewers, Liberty concluded that McAlister was no longer "disabled" as defined in the Policy. AR 669.

On January 20, 2012, McAlister appealed the denial of the LTD benefits, attaching various medical documents to her notice. AR 453–54. McAlister provided medical documents from a treating physician, Dr. Abha Mishra, a neurologist. AR 423–34. The documents show that McAlister received an MRI Without Contrast[2] on December 27, 2011 and an EEG[3] test on December 15, 2011. AR 424, 429. Dr. Mishra concluded that McAlister had an "abnormal EEG." AR. 429. Dr. Mishra also diagnosed McAlister with "Seizure Disorder," "Obstructive Sleep Apnea," and "Depression." AR 428.

A repeat EEG test was conducted on February 17, 2012; according to the results of that test, the EEG was "within normal limits." AR. 158. On January 5, 2012, a follow-up MRI was

---

[2] MRI is the abbreviation of "magnetic resonance imaging." Magnetic Resonance Imaging (MRI) of the Head, WebMD, http://www.webmd.com/brain/magnetic-resonance-imaging-mri-of-the-head (last visited April 10, 2016). "It is a test that uses a magnetic field and pulses of radio wave energy to take pictures of the head." *Id.*; *see also* AR 179.

[3] An EEG refers to an electroencephalogram, "a test that measures and records the electrical activity of [the] brain." Electroencephalogram (EEG), http://www.webmd.com/epilepsy/electroencephalogram-eeg-21508 (last visited April 10, 2016).

also conducted. AR. 167. According to the results, "no abnormal enhancement [was] identified." *Id*.

### D. Liberty solicits additional peer review and later reinstates benefits.

After soliciting additional peer review, on March 26, 2012, Liberty reversed its July 26, 2011 determination to deny benefits and reinstated the LTD benefits "based on a review of the medical documentation contained in the file." AR. 394. According to Liberty, because McAlister's benefits began on August 13, 2010, the 24-month limitation was set to expire on August 12, 2012. *Id.* at 383. For her to be eligible beyond the 24-month mark, McAlister would have to show that she is physically disabled from "Any Occupation."[4] *Id.* As part of an ongoing investigation, Liberty advised that it would contact all relevant treating physicians and asked McAlister to return certain forms by May 5, 2012. *Id.*

### E. Liberty advises McAlister that her LTD benefits will end.

On July 26, 2012, Liberty advised that, based on information in McAlister's file, LTD benefits would be issued through August 12, 2012, based on the 24-month limitation. AR 201– 2. Liberty again reiterated that to be eligible beyond the 24-month limitation, McAlister had to be physically disabled from Any Occupation. *Id.*

### F. McAlister's second appeal.

McAlister appealed the July 2012 decision on January 22, 2013. Eight months later, on September 23, 2013, McAlister submitted medical records in support of the appeal. AR 113–14. When she submitted these records, McAlister's counsel stated that "although . . . McAlister does have significant psychological problems, she also has cognitive problems of an organic etiology . . . ."). AR 114. McAlister enclosed a report of neuropsychological testing by Dr. Melissa

---

[4] "Any Occupation" is defined as "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity." AR 5.

Aubert, and asked Liberty to refer to it "in particular." AR. 114–115; 170–85. In the report, Dr. Aubert states: "McAlister is known to have several conditions that may have a negative impact, including uncontrolled diabetes, hypertension, and hypercholesterolemia. Regardless of the medical cause, Ms. McAlister is experiencing significant impairments in many areas of cognitive functioning . . . ." AR. 181.

Dr. Aubert also states that the "last MRI completed in 2011[] suggest[ed] the presence of a progressive/deteriorating condition." AR. 181. Dr. Aubert recommends additional MRI testing. *See* AR. 181 ("Completion of a repeat MRI with and without contrast . . . is recommended at this time."). However, Dr. Aubert's report does not refer to the follow-up MRI performed on January 15, 2012. *See* AR. 167. Dr. Aubert also does not refer to the follow-up EEG test performed by Dr. Mishra on February 17, 2012. *See* AR. 158.

Dr. Aubert also refers to McAlister's depression, *see* AR 181, and lists Major Depressive Disorder as an Axis I impression, AR 178.[5]

### G. Dr. Alter conducts an independent peer review.

Liberty referred McAlister's claim to David Alter, Ph.D., Board Certified in Psychology. AR. 94–107. According to his report dated January 7, 2014, Dr. Alter reviewed the August 2013 neuropsychological testing (i.e., Dr. Aubert's report) and found that "[Dr. Aubert's] conclusion that the claimant shows evidence of a progressive organic disease affecting her brain is not supported by the data." AR. 104. Dr. Alter suggests that McAlister's cognitive decline is attributable to several factors. *See* AR 102 ("[The] basis of the evidence of acquired cognitive

---

[5] A "multiaxial assessment" "involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome." DSM-TR-IV, at 27. "Axis I covers clinical disorders; Axis II covers personality disorders and intellectual disabilities/mental retardation; Axis III covers general medical conditions, acute medical conditions, and physical disorders; Axis IV covers psychosocial and environmental factors contributing to the disorder; and Axis V pertains to global assessment of functioning." *Koster v. Comm'r of Soc. Sec.*, No. 15-3189, 2016 WL 374080, at *3 n.3 (6th Cir. Feb. 1, 2016).

decline is likely multi-faceted (i.e., psychiatric factors, apneic episodes, poorly managed blood sugars, elevated lipid and hypertension)"). AR. 102. Dr. Alter also states that McAlister suffers from borderline personality disorder, AR. 103. In support of this diagnosis, Dr. Alter describes the evidence he took into consideration—for example, he notes the "documented evidence of extreme reactivity to relatively minor conflicts that include inappropriate verbal outbursts ('rants') at her partner as well as strangers, and frequent activation of suicidal and homicidal thoughts in response to various interpersonal triggering events." AR 102.

### H. *Liberty does not continue benefits after the 24-month period.*

A week later on January 14, 2014, Liberty stated that upon reconsideration of McAlister's request for LTD benefits, those benefits ended on August 12, 2012. AR. 77. Among other things, the decision quotes at length portions of Dr. Alter's conclusions. AR. 79–81. And "[w]ithout proof of impairment from a physical component," Liberty could not approve additional benefits. *Id.*

### 2. District court determination

On January 30, 2014, McAlister brought this ERISA action in district court, seeking review of Liberty's decision. R. 1. On December 12, 2014, McAlister filed a motion for judgment on the administrative record. R. 15. The district court construed Liberty's response brief as a cross-motion for judgment on the administrative record. R. 20 at 230. The district court denied McAlister's motion, granted Liberty's cross-motion, and entered judgment in favor of Liberty. *Id.* It assumed, without deciding, that the 24-month limitation does not apply to mental illnesses with organic causes. *Id.* at 225.

In support of its ruling, the court concluded, among other things, that Liberty presented substantial evidence that McAlister suffered from a mental illness that had a psychiatric cause.

*Id.* The substantial evidence consisted of reports and other notes of Drs. Alter, Burt, and Mishra. *Id.* at 225–27. The district court also criticized Dr. Aubert's report, which McAlister relied "heavily" on to show that she suffered from a mental illness with an organic cause. *Id.* at 227–29. Finally, the district court rejected the argument that Liberty breached its "duty to investigate" as that was "completely contradicted by the record." *Id.* at 229.

## II.     APPELLATE JURISDICTION

Section 502(a)(1)(B) of ERISA authorizes an individual to file a lawsuit "to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *see also* 29 U.S.C. § 1132(e) (authorizing review in district courts for actions brought under § 1132(a)(1)(B)). The district court entered an order denying McAlister's motion for judgment on the administrative record and granting Liberty's cross-motion. R. 20. The district court entered judgment in favor of Liberty, R. 21, and McAlister timely appealed, R. 22. This court thus has appellate jurisdiction under 28 U.S.C. § 1291. *See Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 659 (6th Cir. 2004); *see also Wical v. Int'l Paper Long-Term Disability Plan*, 191 F. App'x 360, 362 (6th Cir. 2006) (per curiam).

## III.    STANDARD OF REVIEW

First, "[w]e review *de novo* the decision of a district court granting judgment in an ERISA disability benefit action based on the administrative record." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006) (citation omitted). "Our review is limited to the administrative record available to the [p]lan [a]dministrator"—in this case, Liberty. *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 343 (6th Cir. 2011) (quoting *Garst v. Wal-Mart Stores, Inc.*, 30 F. App'x 585, 593 (6th Cir. 2002)). Second, a plan

administrator's decision to "deny benefits to a plan recipient is subject to *de novo* review unless the plan provides the administrator with discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Smith v. Continental Cas. Co.*, 450 F.3d 253, 258–59 (6th Cir. 2006) (citation and quotation marks omitted). When the plan administrator wields such discretionary authority—as McAlister concedes Liberty does here, Appellant Br. 4—"[we] review[] a denial of benefits under the highly deferential arbitrary and capricious standard of review." *Id.* (citation and quotation marks omitted).

Under this standard, we uphold the administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd*, 554 U.S. 105 (2008) (internal quotation marks omitted). Thus, "we must evaluate the quality and quantity of the medical evidence and the opinions on both sides of the issues, and decide whether, in light of the administrative record as a whole, the explanation for the decision to deny or terminate benefits is rational." *Cook v. Prudential Ins. Co. of Am.*, 494 F. App'x 599, 604 (6th Cir. 2012) (citations and quotation marks omitted).

In reviewing the quantity and quality of the evidence, we have also said that "substantial evidence" is "more than a mere scintilla." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 171 (6th Cir. 2003) (citation omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). "The fact that the evidence might also support a contrary conclusion is not sufficient to render the plan administrator's determination arbitrary and capricious." *Hurse v. Hartford Life & Accident Ins. Co.*, 77 F. App'x 310, 318 (6th Cir. 2003).[6]

---

[6] McAlister notes that the "application of the arbitrary and capricious standard of review is tempered by the fact that this case concerns the application of a policy limitation to coverage, a point on which Liberty, not Ms.

## IV.    ANALYSIS

On appeal, McAlister argues that "organic, cognitive disorders" are not subject to the Mental Illness Provision. *See* Appellant Br. 17.   According to McAlister, Liberty has agreed with this interpretation in past litigation. *Id.* at 18.   Dr. Aubert's diagnosis of "cognitive disorder, not otherwise specified," McAlister further contends, indicates that her condition is due to a "physiological effect of a general medical condition." *Id.* at 18.   McAlister characterizes this condition as an "organic" disorder. *See id.* at 28–29.   McAlister claims that Liberty lacks "substantial evidence" to support its decision that her condition is subject to the Mental Illness Provision. *Id.* at 18.

### 1.  *Merits of McAlister's appeal.*

In determining whether Liberty's decision is arbitrary and capricious, we ask whether Liberty's decision to deny McAlister LTD benefits is (1) "supported by substantial evidence" and (2) is a "result of a deliberate, principled reasoning process." *Glenn*, 461 F.3d at 666.

In reaching its decision, the district court assumed, without deciding, that the Mental Illness Provision does not apply to mental illnesses with an organic cause.  R. 20 at 225.   On appeal, we accept this assumption, which is favorable to McAlister, because we agree that, even affording her this assumption, her claim fails.[7]  *See Hildebrand v. Fortis Benefits Ins. Co.*, 70 F.

---

McAlister, bears the burden of proof."   Appellant Br. 6 (citing *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 580 (6th Cir. 2002)); *see also McCartha v. Nat'l City Corp.*, 419 F.3d 437, 443 (6th Cir. 2005) ("An ERISA plan, not the participant, has the burden of proving an exclusion applies to deny benefits.").   But McAlister provides no legal authority in support of the proposition that the burden of proof alters the standard of review in any way, and we are aware of none.

[7] Notably, the Mental Illness Provision provides that it applies "*regardless of the underlying cause* of the Mental Illness."  AR 9 (emphasis added).   Therefore, under a less generous reading of the Mental Illness Provision, McAlister's claim would similarly fail.

App'x 798, 802 (6th Cir. 2003) (holding that claimant's disability falls within the 12-month limitation provision even under a reading of the policy in a light more favorable to claimant).[8]

### A. *Whether Liberty's decision is supported by substantial evidence.*

Liberty decided that McAlister was not entitled to benefits beyond twenty-four months because her disability is subject to the Mental Illness Provision. AR. 77–82. The district court concluded that substantial evidence supported Liberty's decision. R. 20 at 225. We agree.

Several medical professionals state that McAlister suffers from either Major Depressive Disorder or Borderline Personality Disorder. For instance, Dr. Alter's report states that McAlister has a "chronic mental health disorder (borderline personality disorder)." AR 103. In support of this diagnosis, Dr. Alter describes the evidence he took into consideration—for example, Dr. Alter noted "documented evidence of extreme reactivity to relatively minor conflicts that include inappropriate verbal outbursts ('rants') at her partner as well as strangers, and frequent activation of suicidal and homicidal thoughts in response to various interpersonal triggering events." AR 102.

The reports and statements of other medical professionals support the conclusion that McAlister had a mental illness. For example, Dr. Burt, McAlister's treating physician, diagnosed McAlister with "Major Depressive Disorder, severe, recurrent as well as Borderline Personality Disorder . . . ." AR 817. After meeting with McAlister twice, Dr. Mirsha concluded that McAlister suffered from depression. AR. 428, 433. Although treating physicians are not entitled to special deference in the ERISA context, we have earlier said that the "opinions of a treating physician" constitute "reliable" evidence. *See Smith*, 450 F.3d at 262. Similarly, after McAlister was discharged from the IOP at Gulf Oak Psychiatric Service, the discharge summary

---

[8] That Liberty has applied the organic-cause limitation to similar mental-illness provisions in past litigation is of no moment given that we have afforded McAlister the benefit of the assumption in this appeal.

notes indicated that McAlister suffered from, among other things, Major Depressive Disorder and Borderline Personality Disorder. AR 844. Even Dr. Aubert, McAlister's own expert, refers to McAlister's depression, *see* AR 181, and lists Major Depressive Disorder as an Axis I impression, AR 178. *See Hildebrand*, 70 F. App'x at 801–02 (noting that claimant's own expert acknowledged that claimant suffered from "Major Depression" and thus claimant's condition fell within the policy's time-limitation); *see also Foltz v. Barnhart Crane & Rigging, Inc.*, No. 15-5907, 2016 WL 796965, at *3 (6th Cir. Feb. 29, 2016) (holding that claimant's argument that plan administrator's decision was not supported by substantial evidence "carrie[d] little weight, as [claimant's] own documentation support[ed] the [plan administrator's] decision"). McAlister does not contest that Major Depressive Disorder and Borderline Personality Disorder are classified as psychiatric conditions in the DSM-IV-TR and thus meet the definition of "Mental Illness." *See* AR 9. Nor does she contest that she has these disorders. Given the opinions of these medical professionals, we conclude that Liberty's termination of McAlister's benefits after the 24-month period is well-supported by substantial evidence.

In arguing that Liberty's decision is not supported by substantial evidence, McAlister tries to discredit Dr. Alter's report, which Liberty cited heavily in its final decision. Appellant Br. 31–33; *see also* AR 79–80. First, she argues that Dr. Alter's report does not "offer any clear opinion as to what [Dr. Alter] believed was the cause of Ms. McAlister's cognitive deficits." Appellant Br. 32. Second, McAlister criticizes one particular statement of Dr. Alter[9] as "insufficient to support a finding that Ms. McAlister's condition is psychological and subject to the mental illness limitation." *Id.* Third, McAlister argues that Dr. Alter's report is

---

[9] Dr. Alter stated: "[Dr. Aubert's] conclusion that the claimant shows evidence of a progressive organic disease affecting her brain in not supported by the data." AR. 104.

"conclusory." *Id.* at 33. Each of these arguments, however, is belied by the record.[10] Even if we take Dr. Alter's report out of the equation as McAlister suggests, her argument still fails. What remains are the notes of three medical professionals—Dr. Burt, Dr. Mishra, and Singleton— whose conclusions she does not rebut. *See Foltz*, 2016 WL 796965, at *3 (noting that claimant failed to rebut plan administrator's evidence). While Liberty did not refer to these reports in its final January 14, 2014 decision letter, *see* AR. 77–82, we may consider these documents because they are part of the administrative record. *See McDonald*, 347 F.3d at 172 (noting that district courts have an "obligation" to review the administrative record, which "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues"). And these documents constitute the "relevant evidence . . . a reasonable mind might accept as adequate to support [the] conclusion" that McAlister suffers from a Mental Illness.[11] *See id.* at 171.

In sum, Liberty's decision to terminate McAlister's LTD benefits at the end of the 24-month period is supported by substantial evidence. We now determine whether the decision is a result of a deliberate, principled reasoning process.

---

[10] McAlister also criticizes Dr. Alter's statement that the "basis of the evidence of acquired cognitive decline is likely multi-faceted (i.e., psychiatric factors, apneic episodes, poorly managed blood sugars, elevated lipid and hypertension)." Appellant Br. 35. According to McAlister, the mental illness must be "due to" the psychiatric or nonorganic cause, *see* AR 21; it is insufficient if the nonorganic or psychiatric cause was a "mere contribut[ing] factor." *Id.* at 35–36. This argument was not raised before the district court and is thus waived. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008) ("[G]enerally . . . an argument not raised before the district court is waived on appeal to this Court.").

[11] McAlister correctly asserts that Liberty has a conflict of interest because of its dual role as both payer of benefits and decision-maker, and that courts treat this conflict as a factor in reviewing a plan administrator's decision. *See* Appellant Br. 5; *Glenn*, 554 U.S. at 111. But as the district court correctly noted, this issue was not explored in discovery, and even considered as a factor on appeal, "we find no circumstances indicating a need to give the conflict significant weight." *See Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 664 (6th Cir. 2013) ("[T]his court has given greater weight to the conflict-of-interest factor when the claimant 'offers more than conclusory allegations of bias.'"); *see also Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 293 n.2 (6th Cir. 2005) ("The Court would have a better feel for the weight to accord this conflict of interest if Calvert had explored the issue through discovery.").

### B. Whether Liberty's decision is a result of a deliberate, principled reasoning process.

The inquiry here is whether Liberty's decision that McAlister has a Mental Illness was a "reasoned judgment." *Elliott*, 473 F.3d at 618. Liberty "could have made a reasoned judgment *only if* it relied on medical evidence that assessed" whether McAlister had a Mental Illness. *See id.* (emphasis added).

It is well-established that a plan administrator should take care that it does not ignore contrary, reliable evidence proffered by the claimant. *See, e.g.*, *Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) ("[A] plan administrator may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician."); *see also O'Callaghan v. SPX Corp.*, 442 F. App'x 180, 184 (6th Cir. 2011) ("[T]he failure to consider evidence that is offered after an initial denial of benefits renders a final denial of benefits arbitrary and capricious.") (quoting *Glenn*, 461 F.3d at 672); *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (stating that plan administrator's ignoring, "without explanation[,] a wealth of evidence that directly contradicted its basis for denying coverage . . . [was] not deliberate or principled"). Even if the plan administrator does not address or discredits such evidence, it does not mean that the plan administrator's decision is automatically considered unreasoned; under those circumstances, the omission weighs in the claimant's favor, but the whole administrative record must be reviewed to determine whether the plan administrator's decision was nevertheless reasoned. *See, e.g.*, *Cook*, 494 F. App'x at 608; *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1066 (6th Cir. 2014).

Applying these principles, we conclude that Liberty's decision was the result of a principled, deliberate reasoning process. The crux of McAlister's appeal is that Dr. Aubert's report was not given the serious consideration that it deserved. But here, Liberty did not

(1) ignore (2) contrary and (3) reliable evidence. First, Dr. Alter reviewed Dr. Aubert's report, and Liberty cited portions of Dr. Alter's report referring to Dr. Aubert's conclusions. AR. 79–80, 100; *see also Wooden v. Alcoa, Inc.*, 511 F. App'x 477, 484 (6th Cir. 2013) ("[T]he file reviewers did not ignore Dr. Riethmiller's analysis, but explained why his diagnosis was questionable.").

Second, Dr. Aubert's report is not "contrary"—after all, as mentioned earlier, Dr. Aubert acknowledges that McAlister suffers from depression. *See Hildebrand*, 70 F. App'x at 801–02. Critically, nowhere in Dr. Aubert's 16-page report does Dr. Aubert mention that McAlister's mental illness has an "organic" cause. *See* AR 170–85. McAlister wants us to provide that missing link, and infer that Dr. Aubert's diagnosis of "cognitive disorder, not otherwise specified" is an "organic" disorder. *See* Reply Br. 6 ("Dr. Aubert also gave a diagnosis . . . that necessarily implies an organic basis") (citing Dr. Aubert's report).[12] In support of this inference, she points to the DSM-IV-TR, which says that the cause of "cognitive disorder not otherwise specified" is "either a general medical condition . . . or substance [abuse], or combination of these factors." DSM-IV-TR, at 135. McAlister argues that this disorder was "formerly called" an "organic mental disorder." Appellant Br. 27. She is correct about this *former* characterization, but the very same text upon which she relies expressly rejects classifying the disorder as such. DSM-IV-TR, at 135 ("The term *organic mental disorder* is no longer used in DSM-IV because it incorrectly implies that 'nonorganic' mental disorders do not have a biological basis."). In any event, we cannot read Dr. Aubert's report to say something that it does

---

[12] Granted, at one point, Dr. Alter characterized Dr. Aubert's report as having concluded that McAlister "shows evidence of a progressive organic disease." AR. 104. However, Dr. Aubert's report is devoid of any express conclusion concerning whether McAlister has an organic disease. Accordingly, regardless of Dr. Alter's characterization, we are left with one doctor who did not opine that McAlister's mental illness has an organic cause, and another doctor who expressly opined that it does not have an organic cause.

not say because "[w]e are not medical specialists and that judgment is not ours to make."[13]

*Elliott*, 473 F.3d at 622–23.

Even if we assume that Dr. Aubert's report suggests that McAlister's mental illness has an organic cause, the report is not reliable because there remain significant problems with it. One problem is its tentative conclusion. In the report, Dr. Aubert states: "McAlister is known to have several conditions that my [sic] have a negative impact on the brain, including uncontrolled diabetes, hypertension, and hypercholesterolemia."[14] AR 181. As Liberty correctly argues, this conclusion is "equivocal and anything but certain." Appellee Br. 38. Another problem is that Dr. Aubert's conclusions appear to rest on a limited set of documents. In the report, Dr. Aubert refers to the EEG completed on December 15, 2011 and the brain MRI performed on December 27, 2011. AR. 173. To Dr. Aubert, the results of these tests suggest the "presence of a progressive/deteriorating condition," and thus she recommends additional testing. *See* AR. 181 ("Completion of a repeat MRI with and without contrast . . . is recommended at this time."). Tellingly, however, Dr. Aubert does not refer to the follow-up EEG performed on February 17, 2012, which was "within normal limits," AR 158, and the follow-up MRI with contrast performed on January 5, 2012, which showed "no abnormal enhancements," AR 167. Based on Dr. Aubert's incomplete assessment, it is unclear whether Dr. Aubert knew about these tests and whether the results of these tests would change her conclusions. Because of the shortcomings of Dr. Aubert's report, Liberty's choice not to credit the report was reasonable. *See, e.g.*, *Smith v. Ameritech*, 129 F.3d 857, 864 (6th Cir. 1997) (noting that it was "reasonable for the [plan administrator] to discount" a physician's diagnosis because it was based on an earlier physical

---

[13] Notably, the DSM-V was the most current edition of the DSM in effect at the time Liberty made its final decision in January 2014. Nevertheless, the distinction between the two editions is of no consequence to the present appeal because neither edition characterizes "cognitive disorder not otherwise specified" as an organic disorder.

[14] We agree with the district court's reading that Dr. Aubert meant "may have." R. 20 at 228 n.1.

examination of the claimant that formed the basis of a less favorable diagnosis); *see also* *Henderson v. Ameritech Corp.*, No. 00-1686, 2001 WL 1823813, at *7 (6th Cir. Dec. 20, 2001) (stating that it was "not arbitrary or capricious for [the defendant] to give more weight to the report of its independent medical examiner" given "the weakness of the evidence produced by the plaintiff's doctors").

McAlister argues that she "specifically alerted" Liberty to her argument that her mental illness had an "organic" cause in a September 23, 2013 letter submitted as part of her second appeal, but that Liberty did not comply with its "duty to fairly and reasonably investigate" McAlister's claim. Appellant Br. 29–30; *see also* AR 114 ("[A]lthough . . . McAlister does have significant psychological problems, she also has cognitive problems of an organic etiology . . . ."). That letter asked Liberty to consider Dr. Aubert's report "in particular." AR 113–14. Specifically, Liberty allegedly failed to, among other things, obtain its own neuropsychological evaluation and ask its peer reviewer to opine on the nature of her condition. Appellant Br. 30.

This argument fails for two reasons. First, while it is clear that plan administrators owe fiduciary duties to beneficiaries, *see Glenn*, 554 U.S. at 111, whether that duty encompasses a duty to reasonably investigate remains unclear. It is even less clear what the parameters of such a duty would entail should one exist. McAlister principally relies on our opinion in *McDonald* for the proposition that a plan administrator had a fiduciary duty to investigate the claimant's arguments, or to discover evidence that either supports or refutes the claimant's theories. Appellant Br. 30. But, in that case, we concluded that a physician's report could be discounted because the physician failed to identify what kind of work the claimant could do; we did not hold that physicians owe a fiduciary duty to claimants. *McDonald*, 347 F.3d at 172. Additionally, we did not discuss the fiduciary duty owed by plan administrators, and so *McDonald* is inapposite.

*See id.* McAlister also relies on the Tenth Circuit in *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004), but in that case, the court expressly rejected the argument that a reasonable duty to investigate exists. *Id.* ("[W]e [do not] suggest that the administrator must . . . consider whether further inquiry might unearth additional evidence when the evidence in the record is sufficient to resolve the claim one way or the other.").

In any event, the parameters of such a duty are altogether undetermined. For instance, McAlister relies on the Ninth Circuit in *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463–64 (9th Cir. 1997), but there, the court criticized the plan administrator for failing to ask for "easily obtainable" evidence from the plaintiff's dentists. Here, McAlister would have Liberty carry out a task that she herself could not accomplish—namely, to provide evidence that her mental illness has an organic cause. Even if we were to adopt the Ninth Circuit's approach, this evidence that Liberty must locate is not of the "easily obtainable" variety that was central to the court's decision.[15] *See also Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 22 (4th Cir. 2014) ("Nothing in our decision requires plan administrators to scour the countryside in search of evidence to bolster a petitioner's case."); *Vega v. Nat'l Life Ins. Servs, Inc.*, 188 F.3d 287, 298 (5th Cir. 1999) (en banc), *overruled on other grounds by Glenn*, 554 U.S. 105 ("There is no justifiable basis for placing the burden solely on the administrator to generate evidence relevant to deciding the claim, which may or may not be available to it, or which may be more readily available to the claimant.").

Second, the specific investigative tasks that McAlister wants Liberty to undertake were either unnecessary or actually done. As an example, the argument that Liberty failed to ask its peer reviewer to opine on McAlister's condition is belied by the record. Not only did Dr. Alter,

---

[15] McAlister's reliance on *Brock v. Walton*, 794 F.2d 586 (11th Cir. 1986) is similarly misplaced, as that case does not refer to a fiduciary duty to investigate.

Liberty's peer reviewer, opine on McAlister's condition, he did so after reviewing the opinion of McAlister's own expert, Dr. Aubert. And if Dr. Alter failed to opine on whether McAlister's mental illness has an organic cause, so did Dr. Aubert. Next, it was unnecessary for Liberty to conduct its own neuropsychological evaluation. Reliance on a file review (in this case, Dr. Alter's report), without an independent neuropsychological evaluation, "does not alone evidence arbitrary and capricious decision making." *Cook*, 494 F. App'x at 606. But "if the physician fails to describe the data he reviewed in reaching his decision or makes credibility determinations concerning the patient's subjective complaints without the benefit of physical examination, reliance on such opinions may tip the scale toward unreliability." *Id.* That did not happen here: Dr. Alter described the evidence he reviewed, AR 102–03, and made no credibility determinations concerning McAlister's subjective complaints.

Accordingly, Liberty's decision to terminate McAlister's LTD benefits at the end of the 24-month period is a result of deliberate, principled reasoning.

## V. CONCLUSION

All in all, Liberty's decision was not arbitrary and capricious. We thus **AFFIRM** the district court's judgment in favor of Liberty.